# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 5, 2016 Session

## CASSIDY LYNNE ARAGON v. REYNALDO MANUEL ARAGON

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Montgomery County**
**No. MCCHCVDI090483  Ross H. Hicks, Judge**
_____

**No. M2014-02292-SC-R11-CV- Filed March 16, 2017**
_____

In this post-divorce litigation, we granted permission to appeal to address the standard for determining what constitutes a "reasonable purpose" for a parent's relocation with the parties' child under Tennessee's parental relocation statute, Tennessee Code Annotated § 36-6-108. In this case, the father spent the majority of the residential parenting time with the parties' child. He sought to move with the child to Arizona because he had secured an advantageous job in an area where he and the child would live near his parents and his extended family and have their support, and where he and the child would live near some of the mother's extended family as well. The trial court held that the father did not have a reasonable purpose for the relocation. In a divided opinion, the Court of Appeals affirmed. The dissent in the Court of Appeals questioned the interpretation of the term "reasonable purpose" used by the majority, which originated in a prior Court of Appeals decision, *Webster v. Webster*, No. W2005-01288-COA-R3CV, 2006 WL 3008019 (Tenn. Ct. App. Oct. 24, 2006), that construed the term "reasonable purpose" to mean one that is significant or substantial when weighed against the loss to the parent opposing the relocation. We overrule *Webster* insofar as it misconstrued the meaning of the term "reasonable purpose" as used in Tennessee's parental relocation statute. Under the natural and ordinary meaning of the term "reasonable purpose," we hold that the father stated a reasonable purpose for relocating to Arizona with the parties' child and that the mother did not carry her burden of establishing a ground for denying the father permission to relocate with the child. Under section 36-6-108(d)(1), "[t]he parent spending the greater amount of time with the child *shall be permitted* to relocate with the child unless the court finds" that the parent opposing the relocation has proven one of the enumerated grounds. Because the mother did not prove a ground to deny permission to relocate, we reverse the trial court's denial of permission for the father to relocate to Arizona with the child, and we also reverse the trial court's modification of the parties' parenting plan to designate the mother as the primary residential parent. On remand, the trial court is authorized to fashion an appropriate transitional parenting plan that results, within a reasonable time, in designating the father as the primary residential parent and

permitting him to live in Arizona with the parties' child. Accordingly, we reverse the trial court and the Court of Appeals and remand the case to the trial court for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Trial Court and Court of Appeals Reversed and Case Remanded to Trial Court**

HOLLY KIRBY, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and ROGER A. PAGE, JJ., joined.

Steven C. Girsky, Clarksville, Tennessee, for the appellant, Reynaldo Manuel Aragon.

M. Joel Wallace, Clarksville, Tennessee, for the appellee, Cassidy Lynne Aragon.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Petitioner/Appellee Cassidy Lynne Aragon ("Mother") and Respondent/Appellant Reynaldo Manuel Aragon ("Father") were married in 2006. In June 2007, one child was born of the marriage, daughter A.C.A. ("Daughter"). About a year later, the parties separated. Divorce proceedings ensued in the chancery court of Montgomery County, Tennessee.[1] In 2010, the trial court entered the final divorce decree. The parties' divorce decree incorporated an agreed parenting plan that did not designate a primary residential parent. The parenting plan provided that the parties would equally share parenting time, 182.5 days per year each, and did not require either to pay child support. The parenting plan explained: "The parties anticipate that their child-sharing arrangement with the children will fluctuate radically based upon antic[ip]ated future work schedules of wife, the husband's school schedule and travel costs back and forth to have visitation with the children, in conjunction with issues relative to a step-child of this relationship." For this reason, they decided to deviate from the Child Support Guidelines and impose "no direct obligation to exchange support."

After the divorce, Father lived in Clarksville, Tennessee, where he pursued an associate's degree in nursing. Mother maintained a residence in Hermitage, Tennessee,

---

[1] Mother's divorce complaint states that the parties had two children. However, the parties later agreed that the other child listed in Mother's complaint, L.O., born in July 2004, is Mother's child from a previous relationship.

about an hour from Clarksville. However, during the parties' separation and after the divorce, Mother spent significant time working overseas as a contractor in human intelligence/targeting analysis.[2]

Due to Mother's work abroad, it is uncontroverted that, after the divorce, Father spent substantially more residential parenting time with their daughter than did Mother.[3] Father also served as the primary caregiver for Mother's older daughter from a previous relationship; both girls were raised together.

In her contracting work, Mother made between $8,000 and $15,000 per month. She also received $560 per month in child support for her older child from that child's father. At times, Mother sent Father financial support, but the amount of support she sent was a subject of dispute in the trial court and is unclear in the record. Mother testified that she sent Father approximately $2,000 per month during the months she was working overseas. She also claimed that she often also forwarded to Father the child support she received for her older child, because Father was caring for both children. Father characterized Mother's payment of child support as "inconsistent," and Mother conceded that she did not always send Father the child support she received for her older daughter even though he was the primary caregiver for both girls and paid for childcare for both.

Prior to Father's anticipated May 2012 graduation from nursing school, Father sought and was offered a nursing job at the Tucson Medical Center in Tucson, Arizona. In March 2012, Father notified Mother that he intended to relocate to Tucson with their child. The notice contained the elements required under Tennessee's Parental Relocation Statute, Tennessee Code Annotated section 36-6-108. The parties could not agree on Father's relocation to Tucson, so on March 26, 2012, Father filed a petition in the trial court asking the trial court to modify the parenting plan and permit Father to relocate to Tucson with Daughter.[4] The petition asserted that the relocation to Tucson was for a

---

[2] The record shows that Mother worked abroad from December 2008 to February 2009, from June 2009 to October 2009, from December 2009 to May 2010, from November 2010 to October 2011, and from December 2011 to May 2012.

[3] Father later testified that he spent 80 percent of the residential parenting time with Daughter.

[4] As discussed in more detail below, at the time of Father's petition and the hearing before the trial court, section 36-6-108(d)(1) provided in pertinent part:

> (d)(1) If the parents are not actually spending substantially equal intervals of time with the child and the parent spending the greater amount of time with the child proposes to relocate with the child, the other parent may, within thirty (30) days of receipt of the notice, file a petition in opposition to removal of the child. The other parent may not attempt to relocate with the child unless expressly authorized to do so by the court

- 3 -

reasonable purpose and was in Daughter's best interest. Tenn. Code Ann. § 36-6-108(e). Father claimed in the petition that his anticipated employment in Tucson offered him "the opportunity for greater income over his current options in the state of Tennessee." Father's petition also noted that he "has an extensive family support system in the Tucson, Arizona area including his parents and several aunts, uncles and cousins" and that the relocation could "provide many opportunities for the minor child to interact with the Father's family that are otherwise unavailable in Tennessee." With the petition, Father proffered a proposed parenting plan that designated him as primary residential parent; it allotted Mother 90 days of residential parenting time and gave Father 275 days of residential parenting time.

In April 2012, Mother filed a response opposing Father's petition to relocate with their child. She asserted that the relocation would cause hardship for her in exercising her residential parenting with Daughter. She claimed that Father's proposed relocation would serve "no purpose," was not in the child's best interest, and would "separate the child from her extended family [including] her half-sister with whom she has a close sister-like relationship."[5]

Pending trial, the parties entered into an agreed order permitting Father to relocate to Arizona with Daughter and establishing a temporary parenting schedule. The temporary schedule gave each party approximately a month of residential parenting time prior to the trial.

---

pursuant to a change of custody or primary custodial responsibility. The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds:

> (A) The relocation does not have a reasonable purpose
>
> (B) The relocation would pose a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody; or
>
> (C) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

Tenn. Code. Ann. § 36-6-108(d)(1) (2007).

[5] In her response, Mother also argued that the proposed relocation posed a specific and serious harm to the child and that Father's motive for relocation was vindictive, intended to "defeat or deter" Mother's parenting rights. Mother submitted no proof at trial supporting these allegations, they were not addressed by the trial court, and Mother does not raise them on appeal, so we do not address them.

## Trial Court Proceedings

The trial was held on non-consecutive days, beginning on July 26, 2012, and resuming on August 3, 2012. The trial court heard testimony from both parties and from Father's parents, and Father submitted the testimony of several more witnesses as well.[6]

In his testimony, Father said that he wanted to relocate because he believed that the overall life he could provide Daughter in Arizona would be better than what he could provide her in Clarksville. He sought stability and the opportunity for her to develop relationships with extended family.

Father testified that he had secured a job as a registered nurse on the neurology floor at Tucson Medical Center, the same hospital where his mother had worked for thirty years. He would earn "$24 an hour plus a 10 percent premium for night shift and then overnight 17 percent added onto that." He chose not to pursue a nursing job in the Clarksville area because it provided no opportunity for them to have support and assistance from his family. Father emphasized that, while neither he nor Mother have family in the Clarksville area, both of them have family in and around Tucson. Relocating to Arizona would allow him to "foster those relationships" and provide a support network for him and the parties' child.

Father said that he had tried to maintain a stable home for the parties' daughter and his stepdaughter while Mother worked overseas. He claimed that Mother "would bounce back and forth between several contracts, either quitting them, doing layoffs, or being fired from them." He said he encouraged the children to maintain a relationship with Mother while she was working abroad.

Father conceded that he had struggled with "trying to find a course in life." During the marriage, he worked at various jobs, each for less than a year. Most of the time while he was in nursing school, Father spent his time studying and caring for the children and did not work outside the home. While he attended nursing school, Father relied on a combination of Mother's financial support, student loans, and credit cards for income.

Mother testified as well. During the marriage, after both Mother and Father spent several months unemployed, she secured a job in Iraq, with the goal of earning enough money for her and Father to both get further schooling. After their divorce, Father expressed a desire to attend nursing school. Mother claimed they agreed that, if Father

---

[6] One of Father's witnesses was also on Mother's witness list, but Mother presented no testimony other than her own.

enrolled in and completed nursing school, "he'd be able to go anywhere and work anywhere . . . and [Mother] could pursue [her] degree as well." Mother testified that she worked several contracting jobs abroad, including a position in Afghanistan. She maintained that she agreed to remain in the Afghanistan position until Father graduated from nursing school. Mother said it was her understanding that, once Father graduated from nursing school, both parties would live in middle Tennessee and equally share residential parenting time; she claimed that Father "said that would be the best situation because it's close to me, the girls could be in a great Mt. Juliet school system, I already have a house there, and we could just do the 50/50."

While working outside of the United States, Mother obtained her bachelor's degree in eighteen months. She believed that leaving the country to "better herself" was the "most sensible option." Mother felt at the time that the "sacrifice" of her being abroad while Father took care of the children and went to school would be "worth it, because both of us would be educated," able to "support ourselves and [the] children and split them 50/50." Mother testified that she earned between $8,000 and $15,000 per month while working outside of the country. She also received $560 a month in child support from her older daughter's father. Mother said that she "often" passed this child support on to Father, who was caring for her older daughter in addition to the parties' daughter.

At the time of trial, Mother was "confident" that she would be offered a job as a research analyst in a criminal justice position in Nashville, but she did not yet actually have a job. She had received several job offers in Washington, D.C., but had not yet made a decision. Mother was considering attending Belmont University College of Law in Nashville, relocating to New Hampshire to attend the University of New Hampshire, or relocating to Fayetteville, North Carolina, to be closer to her older daughter's father. Mother noted that her then-boyfriend was scheduled to be stationed in Fayetteville.

Mother testified that her residence at the time of trial, in Hermitage, Tennessee, was in a beautiful neighborhood. She claimed she would be able to "do everything I need to do to take care of them and to keep them together and make sure they have what they need."

Father called his parents as witnesses. Father's mother, Daughter's paternal grandmother, worked as manager for patient relations at the facility where Father intended to work, the Tucson Medical Center. She had worked at that facility for thirty years. The grandmother said that her work hours were typically from 9:00 a.m. to 5:00 p.m., but she had some flexibility. The grandmother said that she and her husband, Daughter's paternal grandfather, would be available for some childcare for Daughter, including staying at Father's home overnight while Father was working. This testimony

was corroborated by the testimony of the paternal grandfather, who described his work schedule as flexible and said it would be no problem for him to care for Daughter overnight in Father's home while Father worked. He confirmed that Father has considerable extended family in the Tucson area. The grandfather described having the parties' daughter in Arizona as a "grandfather's dream come true."

Father called several other witnesses. The director of the nursing program at Hopkinsville Community College, where Father received his nursing degree, testified that Father had received the program's "outstanding student" award. She recalled Father often referring affectionately to his children. The program director acknowledged that there was an overall nursing shortage and particular shortages in long-term-care facilities, but added that, nevertheless, some facilities were not hiring because they had "learned to do with less." Father also called an instructor at Hopkinsville Community College as a witness. She described the nursing program as very challenging. The instructor said that Father took her class for two semesters. She recalled that Father brought Daughter to class on several occasions and that he seemed to have great affection for her. Father also called as a witness a nursing school classmate, who testified that she and Father often studied together and interacted socially. The classmate said that the nursing program was strenuous but the children were Father's main priority.

A childcare worker at Daughter's daycare center testified that Father was an exceptionally attentive and caring parent. Another childcare worker at the daycare center testified that Father was a "great dad," well-informed about the children's needs and "very patient." Noting that Mother's older daughter also attended the same daycare center, the childcare worker agreed that the children had a "sister-like" relationship but described both as very independent.

Father's neighbor in Clarksville testified that she had been Father's neighbor for the past six years. The neighbor considered Father a friend, and she said that her children often had play dates with Daughter and her half-sister. The neighbor described Father as an "absolutely amazing parent" who went "above and beyond" for both children. She said that her children were at Father's house "often" and she was comfortable with Father supervising her children.

Finally, the trial court heard testimony from Father's friend and former military colleague, who testified that he knew both Mother and Father. He described Father as putting the children "first" and, in contrast, saw Mother as "playing her game or doing her own thing." Of the two parents, he said, he perceived Father as more involved with the children. The former military colleague said that he and his children socialized with Father at least monthly. He acknowledged that he and Father at one point had discussed starting a real estate business but the idea never came to fruition. He said that he had

occasionally gifted small amounts of money to Father and once purchased Father's trailer from him when Father needed money. That concluded the testimony and the trial court took the case under advisement.

Shortly after the trial, because the parties' child had to enroll in school, the trial court issued a temporary order. The temporary order held that Father's proposed relocation was not reasonable. It directed the entry of a new parenting plan designating Mother as the primary residential parent, with alternate residential parenting time for Father during the summer and extended school holidays.

On January 7, 2013, the trial court issued a memorandum opinion that included findings of fact and conclusions of law. The trial court summarized the testimony, generally crediting Mother's testimony, and said that there was "no proof" that Father had better career opportunities in Tucson than in Tennessee because Father had not pursued nursing jobs in Tennessee. It specifically credited Mother's testimony that she gave up her equal residential parenting to work abroad with the understanding that Father would get his nursing education and eventually obtain nursing employment in middle Tennessee. After getting the benefit of this agreement, the trial court found, Father decided to move to Tucson with the parties' daughter. The trial court conceded that Father "posits a rational basis for his move," but it nevertheless held that the proposed relocation was "not reasonable under all the circumstances."

On August 2, 2013, the trial court entered a modified parenting plan that designated Mother as the primary residential parent. The parenting plan gave Mother 285 days of residential parenting time and Father 80 days; it also ordered Father to pay Mother $455 per month in child support. Father appealed.

**Appellate Proceedings**

There were two appeals in this case. In the first, Father argued that the trial court erred in concluding that the requested relocation did not have a reasonable purpose and in concluding that it was in the child's best interest to reside primarily with Mother. *Aragon v. Aragon*, No. M2013-01962-COA-R3CV, 2014 WL 1607350, at *3 (Tenn. Ct. App. Apr. 21, 2014).

Noting that the trial court had made no specific factual findings regarding the best interest of the child, the Court of Appeals declined to address the trial court's finding that the proposed relocation had no reasonable purpose. *Id.* at *6. It stated that "[t]he custody of the child at issue turns on the child's best interest," so consideration of the trial court's holding on reasonable purpose "would be premature" because Tennessee's Parental Relocation Statute required the trial court to make findings on best interest once it

- 8 -

concluded that the proposed relocation was not for a reasonable purpose. *Id.* at *6, *8 (citing Tenn. Code Ann. § 36-6-108(e)). It instead vacated the trial court's decision and remanded the case with directions for the trial court to consider the child's best interest in accordance with Tennessee Code Annotated section 36-6-108(e) and to make appropriate findings of fact pursuant to Rule 52.01 of the Tennessee Rules of Civil Procedure. *Id.* at *9.

On remand, the trial court took no additional proof and both parties filed proposed findings of fact and conclusions of law. On October 24, 2014, the trial court entered an order in which it reviewed the factors relative to the child's best interest set forth in Tennessee Code Annotated sections 36-6-108(e) and 106(a). The trial court restated its earlier holding that Father's relocation did not have a reasonable purpose and then concluded that the evidence on the best interest of the child weighed in favor of naming Mother as the primary residential parent. Father appealed again.

In the second appeal, Father again argued that the trial court erred in holding that his requested relocation did not have a reasonable purpose and in holding that it was in Daughter's best interest to designate Mother as the primary residential parent. In a split opinion, the majority of the Court of Appeals affirmed. *Aragon v. Aragon*, No. M2014-02292-COA-R3-CV, 2015 WL 7752440, at *3 (Tenn. Ct. App. Nov. 30, 2015), *appeal granted* (Mar. 23, 2016).

With respect to the determination that Father's relocation served no reasonable purpose, the majority recited the trial court's view of the testimony, namely, that Father chose not to seek a nursing position in the Clarksville area and that this fact undermined his assertion that he sought to relocate because of better job opportunities in Tucson. *Id.* at *7. It acknowledged the testimony about Father's family support in Tucson but pointed out that the testimony from multiple witnesses in Tennessee indicated that Father also had a support system of friends in the Clarksville area. *Id.* The majority stated that "the trial court implicitly found that the support available in Clarksville was entitled to greater weight in the context of the reasonable purpose inquiry than that in Arizona." *Id.* It deferred to the trial court on the testimony "because the trial court is the sole judge of the weight to be given testimony." *Id.*

Describing the "reasonable purpose" necessary to support a request for relocation, the majority stated: "[T]he 'reasonable purpose' of relocating must be 'substantial when weighed against the gravity of the loss of the non-custodial parent's ability to participate fully in their children's lives . . . .'" *Id.* at *8 (quoting *Redmon v. Redmon*, No. W2013-01017-COA-R3CV, 2014 WL 1694708, at *5 (Tenn. Ct. App. Apr. 29, 2014) (quoting *Webster v. Webster*, No. W2005-01288-COA-R3-CV, 2006 WL 3008019, at *14 (Tenn. Ct. App. 2006)). Under this standard, the majority concluded that the evidence did not

- 9 -

preponderate against the trial court's holding on reasonable purpose. *Id.* It affirmed the trial court's holding on best interest, and it also affirmed the trial court's decision to deny permission for Father to relocate with Daughter and to designate Mother as the primary residential parent. *Id.* at *9.

The dissent disagreed with the majority's holding on reasonable purpose. The dissent viewed the description of "reasonable purpose" recited by the majority as incongruent with the natural and ordinary meaning of the term "reasonable purpose" as used in the Parental Relocation Statute. *Id.* at *9 (McBrayer, J., dissenting). The dissent concluded that Mother had failed to show Father lacked a reasonable purpose for relocating with Daughter. *Id.* Finding no other ground for denying the request to relocate, the dissent would have reversed the trial court's decision and remanded with instructions to approve Father's request to relocate with Daughter. *Id.*

Father sought permission to appeal to this Court, which we granted.

### ANALYSIS

"One of the most common post-divorce flashpoints occurs when the primary residential parent decides to move with his or her child or children to another city or state." *Collins v. Coode*, No. M2002-02557-COA-R3-CV, 2004 WL 904097, at *2 (Tenn. Ct. App. Apr. 27, 2004). Parental relocation cases are often wrenching, with weighty competing considerations and a profound impact on both parents and children. Except for one opinion on the limited issue of how to measure each parent's time with their child, *see Kawatra v. Kawatra*, 182 S.W.3d 800, 802 (Tenn. 2005), this Court has not addressed Tennessee's Parental Relocation Statute, Tennessee Code Annotated section 36-6-108, since its enactment. We do so now.

### Overview

For many years prior to the enactment of the Parental Relocation Statute, under Tennessee caselaw, custodial parents[7] had virtually unfettered authority to move their children away from non-custodial parents, regardless of reason. *See Thomas v. Thomas*, 335 S.W.2d 827, 828 (Tenn. 1960) ("[T]he mother had the right to control the child's whereabouts and the father had no voice where the child should reside . . . ."). As time went on, the value of having both parents involved in child-rearing became more broadly

---

[7] Our child custody statutes now refer to the "primary residential parent" and the "alternate residential parent," but the cases that form the backdrop for Tennessee's Parental Relocation Statute used the now-passé terms "custodial parent" and "non-custodial parent," so we will do the same in discussing those cases.

recognized. Tennessee courts began to hold that a non-custodial parent could prevent relocation of his child under some circumstances, provided the non-custodial parent could prove that the move was not in the best interest of the child. *See, e.g, Walker v. Walker*, 656 S.W.2d 11, 18 (Tenn. Ct. App. 1983), *overruled by Seessel v. Seessel*, 748 S.W.2d 422, 424 (Tenn. 1988); *see also Taylor v. Taylor*, 849 S.W.2d 319, 322 (Tenn. 1993). However, because there was no statute governing the issue, trial court decisions varied widely.

In light of these developments, this Court issued a series of decisions aimed at clarifying the law for trial courts and parents alike. The first was *Seessel v. Seessel*, 748 S.W.2d 422, 424 (Tenn. 1988). In *Seessel*, the trial court had denied the mother's request to relocate with the parties' child from Memphis to Denver, Colorado. *Id*. at 422. The intermediate appellate court reversed, and this Court granted permission to appeal "in order to correct a misapprehension of the law in this State in reference to the burden of proof involving the relocation and removal of minor children." *Id*. at 423. It overruled *Walker* and its progeny and held that "[t]he burden of proof in such cases remains with the [custodial parent seeking to relocate] to show that the best interests of the child will be better served by its relocation." *Id*. at 424.

*Seessel* sparked a pronounced increase in parental relocation litigation. *See Taylor*, 849 S.W.2d at 326 n.8. This motivated the Court to attempt to refine its standards for relocation in *Taylor v. Taylor*, 849 S.W.2d at 331. In a dense and somewhat confusing opinion, the *Taylor* Court held that much of *Seessel* remained good law, but then went on to list at least nine factors to be considered in relocation cases, along with a catchall, "any related factual circumstances found by the court to be significant in a given situation, [to] be weighed individually and collectively." *Id*. at 332.

Not surprisingly, instead of clarifying and simplifying the law on relocation, *Taylor* only spawned further uncertainty. Conceding that *Taylor* was "admittedly obscure," the Court took up the issue again in *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996), *clarified on reh'g* (June 24, 1996), the decision that provided the framework for the current statute. In *Aaby*, the custodial mother had remarried and sought to relocate with the parties' son to Kentucky, where her new husband had family. The son's father opposed the move. *Id*. at 624.

The trial court initially denied the mother's petition to relocate, then it reversed itself after this Court's opinion in *Taylor* was released, and later it reversed itself again, finally holding that the mother had not proven that the move was in the child's best interest. The mother appealed and the intermediate appellate court affirmed the trial court's denial of her petition to relocate. In an effort to quell the confusion and settle the law, this Court granted the mother's request for permission to appeal. *Id*. at 624-25.

After reviewing the caselaw on relocation, the *Aaby* Court reaffirmed the goals expressed in *Taylor*, which were to "(1) limit[] judicial intervention in post-divorce family decision-making, and (2) mak[e] disputes easier of resolution if they must be litigated." *Aaby*, 924 S.W.2d at 629 (quoting *Taylor*, 849 S.W.2d at 331). The Court observed that "the interests of the custodial parent and the interests of the child are basically interrelated, even if they are not always precisely the same." *Id.* It then overruled prior caselaw and adopted a standard that made it quite difficult for a non-custodial parent to defeat the custodial parent's petition to relocate with the parties' child: the petition would be denied only if the non-custodial parent could prove that the custodial parent's motives were vindictive or that the move posed a specific, serious threat of harm to the child.[8] *Id.* at 629-630. Finding no such proof, the *Aaby* Court held in favor of the mother, permitting relocation. *Id.* at 630.

While the standard adopted in *Aaby* came closer to achieving the stated goals of limiting judicial intervention and easing the resolution of disputes, it was harsh for non-custodial parents. This prompted a poignant dissent by Justice Penny White, who protested that the standard adopted by the majority permitted a custodial parent to move out of the jurisdiction for "no reason at all," so long as the move was not shown to be

---

[8] The *Aaby* Court explained the standard as follows:

> [W]e conclude . . . that a custodial parent will be allowed to remove the child from the jurisdiction unless the non-custodial parent can show, by a preponderance of the evidence, that the custodial parent's motives for moving are vindictive—that is, intended to defeat or deter the visitation rights of the non-custodial parent.
>
> This conclusion does not mean, however, that a non-custodial parent's hands are tied where removal could pose a specific, serious threat of harm to the child. In these situations, the non-custodial parent may file a petition for change of custody based on a material change of circumstances. The petition would state, in effect, that the proposed move evidences such bad judgment and is so potentially harmful to the child that custody should be changed to the petitioner. . . . However, . . . testimony that removal could be generally detrimental to the child will usually not suffice to establish an injury that is specific and serious enough to justify a change of custody. A move in any child's life, whether he or she is raised in the context of a one or two parent home, carries with it the potential of disruption; such common phenomena—both the fact of moving and the accompanying distress—cannot constitute a basis for the drastic measure of a change of custody.

*Aaby*, 924 S.W.2d at 629-630 (footnote omitted).

- 12 -

either vindictive or intended to defeat the non-custodial parent's visitation rights. *Id.* at 631.[9]

In 1998, in the wake of *Aaby*, Tennessee's legislature considered competing approaches to parental relocation and ultimately adopted a statute that largely follows the *Aaby* framework, Tennessee Code Annotated section 36-6-108,[10] the Parental Relocation Statute at issue in this case.[11]

---

[9] The dissent stated:

> [T]he rule [adopted by the majority], in my estimation, undermines the important efforts of those non-custodial parents who work diligently to be more than every other week-end mothers and fathers. While adjusting visitation schedules to accommodate a move aims to allow the non-custodial parent a continued relationship with the child, it does nothing to accommodate or encourage the non-custodial parent who wants to attend Johnny's choir recital; Mary's soccer game; or both children's monthly parent-teacher conferences. The rule set forth by the majority allows a custodial parent to relocate to a distance that, in effect, prohibits the important non-custodial parental involvement described above. The move could be for no reason at all, so long as it could not be proved that the move was "vindictive" or "intended" to defeat visitation rights. I believe that such an approach unduly impedes that which we all desire—an opportunity for children of divorced parents to have meaningful relationships with both parents despite the parents' inability to remain married.

*Aaby*, 924 S.W.2d at 631 (White, J., dissenting) (footnote omitted).

[10] In the same legislative session, a competing bill was introduced that would have adopted a different approach. The summary for this legislation explained: "This bill would establish a set of factors to aid a court in determining whether or not to grant a primary residential parent's request to relocate a child, a move that would materially affect the current schedule of contacts and access with the secondary residential parent. Under this bill, there would be no presumption either in favor of or against such a request." See H.B. 2701/S.B.3126 Bill Summary, available at: http://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=hb2701&GA=100. After spirited debate, this bill was abandoned in favor of Tenn. Code Annotated § 36-6-108.

[11] The bill summary for the legislation enacting section 36-6-108 states:

> When deciding whether or not a custodial parent may move out of state with the parent's child (known as removal), courts rely on precedent derived from a series of cases throughout the years. In 1996, in order to dispel ambiguities that had resulted from varying cases, the Supreme Court in the case of *Aaby v. Strange* clarified the law of removal. The court stated that the two goals with which previous removal cases had been concerned were: limiting judicial intervention in post-divorce family decision making; and making disputes easier of resolution if they must be litigated.

> The *Aaby* court felt that the above goals must determine the law, and the court found that the interest of the custodial parent and the best interest of the child were interrelated.

The Parental Relocation Statute sets out a comprehensive framework for disputes involving the relocation of a primary residential parent, beginning with detailed requirements for notice to the non-relocating parent:

(a) If a parent who is spending intervals of time with a child desires to relocate outside the state or more than one hundred (100) miles from the other parent within the state, the relocating parent shall send a notice to the other parent at the other parent's last known address by registered or certified mail. Unless excused by the court for exigent circumstances, the notice shall be mailed not later than sixty (60) days prior to the move. The notice shall contain the following:

(1) Statement of intent to move;

(2) Location of proposed new residence;

(3) Reasons for proposed relocation; and

(4) Statement that the other parent may file a petition in opposition to the move within thirty (30) days of receipt of the notice.

Tenn. Code Ann. § 36-6-108(a) (2012).[12]  Thus, addressing one of the concerns raised in the *Aaby* dissent, the notice requires the parent who seeks to relocate with the child to

---

Based on these findings, the court concluded that a custodial parent is allowed to remove the child unless the non-custodial parent can show, by a preponderance of the evidence, that the custodial parent's motives for moving are vindictive in that they are intended to defeat or deter the non-custodial parent's visitation rights; however, the court stated that the non-custodial parent would have a basis for challenging removal where it could pose a specific, serious threat of harm to the child.  The court further concluded that if the parties cannot reach an acceptable visitation schedule, the custodial parent seeking to remove the child must file a petition with the court to reapprove or revise the existing schedule. The court expressly overruled any prior laws inconsistent with these conclusions.

It is with this background that Public Chapter 910 sets standards for a custodial parent relocating with a child.

*See* H.B. 2701/S.B. 3126 Bill Summary, available at: http://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=HB2897&ga=100.

[12] The above-quoted provisions reflect the statute as it read at the time of the trial in this cause.  In 2013, subsection (a) was amended to require notice to the alternate parent when the relocating parent

state the "[r]easons for the proposed relocation." *Id.* at subsection (a)(3); *Aaby*, 924 S.W.2d at 631 (White, J., dissenting). The relocating parent then may petition for modification of the parties' parenting plan to accommodate the move. Tenn. Code Ann. § 36-6-108(b).

Regardless of the proportion of residential parenting time the non-relocating parent spends with the subject child, if he opposes the proposed relocation with the child, he may file "a petition in opposition to removal of the child." Tenn. Code Ann. § 36-6-108(c), (d). If the parents "are actually spending substantially equal intervals of time with the child," then there is "[n]o presumption in favor of or against the request to relocate with the child." Tenn. Code Ann. § 36-6-108(c). The court then determines whether to permit the requested relocation "based upon the best interests of the child."[13] *Id*.

If the parents are not spending substantially equal intervals of residential parenting time with the child, the statute provides the following framework for resolving the dispute:

> (d)(1) If the parents are not actually spending substantially equal intervals of time with the child and the parent spending the greater amount of time with the child proposes to relocate with the child, the other parent may, within thirty (30) days of receipt of the notice, file a petition in opposition to removal of the child. The other parent may not attempt to relocate with the child unless expressly authorized to do so by the court pursuant to a change of custody or primary custodial responsibility. The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds:
>
> (A) The relocation does not have a reasonable purpose;
>
> (B) The relocation would pose a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody; or

planned to move more than 50 miles away rather than 100 miles. *See* 2013 Pub. Acts, c. 352, § 1, eff. July 1, 2013; 2014 Pub. Acts, c. 617, §§ 5, 6, eff. July 1, 2014. In 2016, it was again amended to add the phrase, "After custody or co-parenting has been established by the entry of a permanent parenting plan or final order" at the beginning of the subsection. *See* 2016 Tenn. Laws Pub. Ch. 814 (S.B. 2483).

[13] In 2014, section 36-6-108 was amended to direct trial courts to consider additional factors in making the best interest determination. *See* 2014 Tennessee Laws Pub. Ch. 617 (S.B. 1488).

(C) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

Tenn. Code Ann. § 36-6-108(d) (2012). Thus, under the statute, a parent spending the greater amount of residential parenting time with the child who seeks to relocate "shall be permitted" to do so unless the parent opposing the move proves at least one of three grounds. Two of the grounds are similar to the grounds set forth by the *Aaby* majority: the parent's motive for relocating with the child is vindictive, or the relocation poses a threat of specific and serious harm to the child.[14] Tenn. Code Ann. § 36-6-108(d)(1)(B)-(C) (2012). The statute also, however, includes a third ground for opposing relocation that hearkens to the dissent in *Aaby*, that is, if the parent opposing relocation proves that the proposed relocation "does not have a reasonable purpose." Tenn. Code Ann. § 36-6-

---

[14] As in *Aaby*, the examples of a "threat of specific and serious harm" recited in the Parental Relocation Statute make it clear that the statutory term does not mean simply the disruption and distress which normally accompanies a move:

> (2) Specific and serious harm to the child includes, but is not limited to, the following:
>
> (A) If a parent wishes to take a child with a serious medical problem to an area where no adequate treatment is readily available;
>
> (B) If a parent wishes to take a child with specific educational requirements to an area with no acceptable education facilities;
>
> (C) If a parent wishes to relocate and take up residence with a person with a history of child or domestic abuse or who is currently abusing alcohol or other drugs;
>
> (D) If the child relies on the parent not relocating who provides emotional support, nurturing and development such that removal would result in severe emotional detriment to the child;
>
> (E) If the custodial parent is emotionally disturbed or dependent such that the custodial parent is not capable of adequately parenting the child in the absence of support systems currently in place in this state, and such support system is not available at the proposed relocation site; or
>
> (F) If the proposed relocation is to a foreign country whose public policy does not normally enforce the visitation rights of non-custodial parents, that does not have an adequately functioning legal system or that otherwise presents a substantial risk of specific and serious harm to the child.

Tenn. Code Ann. § 36-6-108(d)(2) (2012).

- 16 -

108(d)(1)(A) (2012); *Aaby*, 924 S.W.2d at 631 (White, J., dissenting). The next subsection indicates that the court must address whether relocation is in the best interest of the child if—and only if—the parent opposing relocation proves at least one of the three enumerated grounds. *See* Tenn. Code Ann. § 36-6-108(e) (2012); *see also Kawatra*, 182 S.W.3d at 802.

In sum, then, where the parents are not spending substantially equal periods of time with their child, the parent seeking to relocate must notify the other parent of the intent to relocate and state his or her reasons for the proposed relocation. Tenn. Code Ann. § 36-6-108(a)(3) (2012). The burden then falls to the parent opposing the move to file a petition and prove one of the enumerated grounds. Tenn. Code Ann. § 36-6-108(d)(1)(A) (2012). If this burden of proof is carried, the trial court may consider the best interest of the child and decide whether to permit the relocation. Tenn. Code Ann. § 36-6-108(e). If this burden of proof is not carried, the trial court is obliged to grant permission for the relocation. Tenn. Code Ann. § 36-6-108(d)(1).

Thus, rather than leave the decision in parental relocation matters to trial courts, with widely varying approaches, results, and timelines, the legislature chose to enact a statute with a mandatory structure that drastically limits the trial court's discretion and compresses the timeline for resolution. The statute includes a presumption in favor of permitting relocation, which appears to reflect the *Aaby* majority's observation that "the interests of the custodial parent and the interests of the child are basically interrelated, even if they are not always precisely the same." *Aaby*, 924 S.W.2d at 629. The statutory structure facilitates the goals, reiterated in *Aaby*, of limiting judicial intervention and making disputes easier to resolve if they must be litigated. *Id.*

Against this backdrop, we address the issues presented in this appeal. In this case, even though the parenting plan awarded the parties equal residential parenting time with their child, the trial court found that Father spent substantially more residential parenting time with Daughter, and Mother has not appealed this finding. Consequently, it is uncontroverted that that the statutory provisions applicable to this appeal are those that govern parental relocation petitions where the parties do not spend equal intervals of time with the subject child. *See* Tenn. Code Ann § 36-6-108(d).

### Application of Statute

We now consider how the trial court's analysis squares with the analytical framework set forth in the Parental Relocation Statute.

After reviewing the testimony,[15] the trial court in this case denied Father permission to relocate on the ground that his proposed relocation was not for a reasonable

[15] The trial court summarized its view of the pertinent testimony as follows:

9. The proof shows that the parties were married in Clarksville, Tennessee, in 2006. Defendant was in the army at the time. At some point the parties moved to Tucson, Arizona, where Mr. Aragon's immediate family lived. When their child, [Daughter], was born July 19, 2007, the parties were then living in the living room of Mr. Aragon's parents' home. Both Plaintiff and Defendant were unemployed at the time. Mr. Aragon decided that he wanted to be a policeman and pursued that at least to the extent of making inquiries and/or beginning some training. However, he determined that he did not want to pursue that career in the Tucson area as it was too dangerous. He had some connections in New Hampshire and moved his family there for the purpose of pursuing his law enforcement career in New Hampshire. After arriving in New Hampshire however, he abandoned that idea and later decided that he would move his family back to Clarksville, Tennessee, to pursue a business opportunity with one of his former army buddies. The parties separated sometime after they moved back to Tennessee.

10. The business opportunity in Tennessee did not pan out and Mr. Aragon never obtained employment. Ultimately the parties decided that Mrs. Aragon would go to work and that Mr. Aragon would go to school. Because of Mrs. Aragon's educational background and work opportunities, she was able to make a substantial income if she would agree to work on a contract basis overseas. Mrs. Aragon had a child by a former relationship and the parties agreed that Mr. Aragon would care for [Daughter] and the other child, go to school and that Mrs. Aragon would go overseas to work and provide income for the family. It was not clear from the proof when this arrangement was agreed upon but it existed prior to the divorce and continued after the divorce. When Mr. Aragon completed his schooling, he notified Mrs. Aragon of his intended relocation to Arizona for the purpose of accepting employment there and Mrs. Aragon filed her objection to the relocation.

11. Since at least April of 2010 (the divorce), it is clear that Mrs. Aragon has sacrificed her parenting time in order to provide income for the family and enable Mr. Aragon to complete his education. This was done with Mr. Aragon's express approval and agreement. Mrs. Aragon testified (not denied by Mr. Aragon) that the parties had agreed that this arrangement would continue until such time as Mr. Aragon graduated and then it was anticipated that he would get employment in the Clarksville, Tennessee area and the parties would resume their 50/50 parenting arrangement with regard to both children.

12. Although it is clear that Mr. Aragon has spent substantially more time with both children, this occurred as a result of the arrangement the parties made whereby Mrs. Aragon would be the provider for the family and work overseas while Mr. Aragon pursued his education and cared for the children.

13. In December of 2011, Mr. Aragon first raised the prospect of returning to Arizona. Mrs. Aragon made it known that she would not agree. Mrs. Aragon testified (and Mr. Aragon did not deny) that in all their previous discussions concerning Mr. Aragon's

purpose. As noted above, the trial court credited Mother's testimony that she had sacrificed her parenting time with her daughters in order to secure work to support the family and allow both parents, first Father and then Mother, to further their education. It credited Mother's testimony that the parties had an understanding that, once Father completed his nursing education, they would both settle in middle Tennessee and essentially split their parenting time equally. The trial court observed that, even though Father's immediate and extended family live in Tucson and Mother also has family in the Tucson area, Father had plenty of friends to support him in the Clarksville area. It pointed out that, although Father secured employment in Tucson, he did not seek a nursing position anywhere in middle Tennessee:

> There is no proof in this case that Mr. Aragon has better job opportunities, greater salary opportunities or career advancement opportunities in the Tucson area. In fact, there is no proof whatsoever with regard to Mr. Aragon's comparable job opportunities in the Middle Tennessee or Southern Kentucky area because he has not made any inquiries or pursued such opportunities.

Tying all of these facts together, the trial court summarized:

> The parties agreed that Mrs. Aragon would give up her equal parenting time, travel overseas and provide a substantial income to the parties so that Mr. Aragon could go to school and find productive employment. After

post[-]graduation plans that Mr. Aragon had indicated he would want to stay in the general Nashville/Clarksville area because of the support system he had developed to include his old army buddies, a distant family connection in Nashville, and classmates, faculty and friends from school.

14. Mr. Aragon has graduated from nursing school and has obtained employment in a[n] entry-level position at Tucson Medical Center. He testified that he had not specifically sought employment in either the Clarksville–Montgomery County, Tennessee area, the Nashville area or the Middle Tennessee area prior to accepting employment in Tucson. He testified that he had rented an apartment in Tucson but still continued to own a residence in Clarksville.

15. Defendant cites in his petition as a reason for his move to Tucson, "greater opportunity for greater income" and the "support, companionship and assistance of family and friends in the Tucson area". He produced 9 witnesses, 7 of them from the Clarksville area in support of his petition. This number of witnesses and testimony is indeed indicative that Mr. Aragon does indeed have a strong support network in this area. This substantiates and lends credibility to Mrs. Aragon's testimony that until December, 2011, Mr. Aragon had always indicated his intentions to stay and work in this area after his graduation.

- 19 -

getting the benefit of this agreement, (i.e. going to school, receiving Mrs. Aragon's financial support, and graduating from school) he then decided not to pursue employment in this area[,] as had previously been assumed, and moved to Tucson.

The trial court then concluded: "While it appears that Defendant posits a rational basis for his move, the move is nonetheless not reasonable under all the circumstances." Having found that Father's proposed relocation was not for a reasonable purpose, the trial court went on to consider the child's best interest and ultimately designated Mother as the primary residential parent.

We consider first whether the trial court's analysis comports with the allocation of the burden of proof set forth in the Parental Relocation Statute. Procedural issues such as the burden of proof "are of consequence in custody proceedings because following consistent and correct procedures is one of the surest ways for the courts to make real the legal system's aspiration to provide equal justice under the law." *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *3 (Tenn. Ct. App. July 21, 1999). "Procedural rules are particularly important in domestic relations matters because they provide the chief means for keeping the exercise of judicial discretion within proper bounds." *Id.* (citing Carl E. Schneider, *Discretion, Rules, and Law: Child Custody and the UMDA's Best-Interest Standard*, 89 Mich. L.Rev. 2215, 2218 (1991) (noting that "family law lives in a tension between according officials discretion to make decisions and limiting that discretion by requiring them to follow rules")).

As discussed above, where the parents are not spending substantially equal time with their child, section 36-6-108 includes a legislatively mandated presumption in favor of permitting the parent spending the most residential parenting time with the child to relocate with the child. *See* Tenn. Code Ann. § 36-6-108(d) (providing that the relocating parent "shall" be permitted to do so unless the court finds one of the enumerated grounds). The petitioner—the parent opposing relocation—bears the burden of proving grounds for denying permission to relocate. *Id.* This allocation of the burden of proof has been recognized repeatedly by our Court of Appeals. *See, e.g.*, *Rogers v. Rogers*, No. W2006-00858-COA-R3-CV, 2007 WL 1946617, at *6 (Tenn. Ct. App. July 3, 2007); *Redmon*, 2014 WL 1694708, at *5; *Rudd v. Gonzalez*, No. M2012-02714-COA-R3CV, 2014 WL 872816, at *7 (Tenn. Ct. App. Feb. 28, 2014); *Lima v. Lima*, No. W2010-02027-COA-R3CV, 2011 WL 3445961, at *3 (Tenn. Ct. App. Aug. 9, 2011); *In re Iyana R.W.*, No. E2010–00114–COA–R3–JV, 2011 WL 2348458, at *3 (Tenn. Ct. App. Jun. 8, 2011); *Webster*, 2006 WL 3008019, at *13; *Clark v. Clark*, No. M2002-03071-COA-R3-CV, 2003 WL 23094000, at *3 (Tenn. Ct. App. Dec. 20, 2003)); *Elder v. Elder*, No. M1998-00935-COA-R3-CV, 2001 WL 1077961, at *5 (Tenn. Ct. App. Sept. 14, 2001).

In the instant case, in support of its holding that the proposed move had no reasonable purpose, the trial court commented that there was "no proof in this case that Mr. Aragon has better job opportunities, greater salary opportunities or career advancement opportunities in the Tucson area" and "no proof whatsoever with regard to Mr. Aragon's comparable job opportunities in the Middle Tennessee or Southern Kentucky area because he has not . . . pursued such opportunities." These comments appear to place the burden of proof on Father to show a reasonable purpose for the move, rather than placing the burden of proof where the statute requires, on Mother as the parent opposing the relocation.[16] *See Redmon v. Redmon*, No. W2013-01017-COA-R3CV, 2014 WL 1694708, at \*6-7 (Tenn. Ct. App. Apr. 29, 2014) ("Father argues that, so long as he has shown that Mother did not look 'hard enough' for a job nearer McNairy County, he has carried his burden of proving lack of reasonable purpose for Mother's proposed relocation. . . . Father's position is at odds with the established burden of proof in parental relocation cases.").

Father argues next that the trial court ascribed an overly expansive meaning to the term "reasonable purpose" as used in section 36-6-108(d)(1). Father relies on the dissent in the Court of Appeals' decision, *Aragon*, 2015 WL 7752440, at \*9, which criticized the majority's recitation of a quote indicating that a "reasonable" purpose for a proposed relocation must be "significant" and "substantial." *Id.* at \*8 (quoting *Redmon*, 2014 WL 1694708, at \*5).

In the passage quoted by the majority on the Court of Appeals below and criticized by the dissent, the *Redmon* court was quoting a prior Court of Appeals' decision in *Webster v. Webster*, No. W2005–01288-COA-R3-CV, 2006 WL 3008019, at \*14 (Tenn. Ct. App. Oct. 24, 2006).[17] In *Webster*, the Court of Appeals reviewed the development of Tennessee's Parental Relocation Statute, along the lines of the above outline. *Id.* at \*10-14. It noted, as we have done, that the statute is patterned largely after the analytical framework outlined in the majority opinion in *Aaby* but also addresses some of the concerns raised in Justice White's dissent in *Aaby*. *Id.* at \*13. It explained that section 36-6-108 carries a strong presumption in favor of the relocating parent, mandating a grant of permission to relocate unless the parent opposing relocation proves at least one of the three enumerated grounds. *Id.*

---

[16] The majority on the Court of Appeals below seemed to acknowledge the trial court's misapplication of the burden of proof but did not directly address it. *Aragon*, 2015 WL 7752440, at \*7 n.5 ("We acknowledge Father's argument that Mother did not satisfy her burden 'to produce evidence from which such a [job] comparison could be made.'") (quoting *Redmon*, 2014 WL 1694708, at \*7).

[17] *Webster v. Webster* was authored by the undersigned while a member of the Court of Appeals.

The *Webster* court interpreted the phrase "reasonable purpose" in light of the fact that the legislature drew from both the *Aaby* majority and the *Aaby* dissent in fashioning the statute:

> Although the statute does not elaborate on the meaning of the ground that the relocation "does not have a reasonable purpose," since the statute was apparently enacted with reference to the court's opinion and dissent in *Aaby v. Strange,* we interpret the statute against that backdrop. In her dissent, Justice White obviously emphasized the seriousness of the loss, to the child as well as the non-custodial parent, of the opportunity for the non-custodial parent to participate in the child's activities, such as soccer games and recitals, even if the activities do not fall within the non-custodial parent's designated "parenting time." *Aaby,* 929 S.W.2d at 631. She advocated requiring the parent who proposes to relocate to establish "some reason" for the move, observing that such a rule would oblige the custodial parent to "deliberate" and "evaluate" a decision to move, without impeding "the custodial parent's freedom of movement. . . ." *Id.* She advocated an approach that would "not destroy the efforts" of non-custodial parents "to participate more fully in their children's lives. . . ." *Id.*

*Webster*, 2006 WL 3008019, at *13 (quoting *Aaby*, 924 S.W.2d at 631 (White, J., dissenting)). *Webster* then observed:

> While the *Aaby* dissent advocated requiring the relocating parent to prove "some reason" for the move, the statute ultimately enacted incorporated a more rigid structure. . . . [Under the Parental Relocation Statute,] the parent seeking to relocate is required initially to state his or her reasons for the proposed relocation. T.C.A. § 36-6-108(a)(3) (2005). The burden then is on the parent opposing the move to prove that the proposed relocation "does not have a reasonable purpose." T.C.A. § 36-6-108(d)(1)(A) (2005). If this burden of proof is not carried, the trial court is obliged to grant permission for the relocation. *Id.*

*Id*. at *13-14. Interpreting the statutory term "reasonable purpose" against this background, *Webster* concluded with the quote excerpted by the majority of the Court of Appeals below: "In context, it is clear that the 'reasonable purpose' of the proposed relocation must be a significant purpose, substantial when weighed against the gravity of the loss of the non-custodial parent's ability 'to participate fully in their children's lives in a more meaningful way.'" *Id*. at *14 (quoting *Aaby*, 924 S.W.2d at 631 (White, J., dissenting)).

The *Webster* court's interpretation of "reasonable purpose" has since found its way into numerous Court of Appeals decisions on parental relocation. *See, e.g.*, *Kephart v. Schwarzer Kephart*, No. M2015-02285-COA-R3-CV, 2016 WL 6299467, at *3 (Tenn. Ct. App. Oct. 26, 2016*); *Slavko v. Slavko*, No. M2015-01267-COA-R3-CV, 2016 WL 4768883, at *3 (Tenn. Ct. App. Sept. 9, 2016); *Mackey v. Mayfield*, No. E2014-02052-COA-R3-CV, 2015 WL 5882657, at *6 (Tenn. Ct. App. Oct. 8, 2015); *Lawrence v. Broadnax*, No. E2015-00214-COA-R3-CV, 2015 WL 10319306, at *6 (Tenn. Ct. App. July 31, 2015); *Rudd v. Gonzalez*, 2014 WL 872816, at *9-10 (Tenn. Ct. App. 2014); *Redmon*, 2014 WL 1694708, at *5 (Tenn. Ct. App. 2014); *Sanko v. Sanko*, No. E2014-01816-COA-R3-CV, 2015 WL 4199204, at *8 (Tenn. Ct. App. June 16, 2015), *perm. app. denied* (Tenn. Nov. 24, 2015); *Carman v. Carman*, No. M2011-01265-COA-R3CV, 2012 WL 1048600, at *4 (Tenn. Ct. App. 2012).

The dissent in the Court of Appeals below asserted that construing the term "reasonable purpose" to mean "significant" and "substantial" is outside the range of what could be considered the ordinary and natural meaning of the words; it posited that the *Webster* interpretation serves to "connote a weightier reason and, thus, place a lighter burden on the non-custodial parent opposing relocation than a fair reading of the Parental Relocation Statute supports." *Aragon*, 2015 WL 7752440, at *11 (McBrayer, J., dissenting). This point is well taken; therefore, we consider further the *Webster* court's construction of the statutory language.

Because the term "reasonable purpose" is not defined in the Parental Relocation Statute and its meaning is not necessarily plain, we consider the legislative history. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010) (citing *Calaway ex rel. Calaway v. Schucker*, 193 S.W.3d 509, 516 (Tenn. 2005); *In re Conservatorship of Clayton*, 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995)). "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995) (citing *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993)); *Carter*, 279 S.W.3d 560, 564 (Tenn. 2009) (citing *State v. Sherman*, 266 S.W.3d 395, 401 (Tenn. 2008)). In construing statutes, we seek to give effect to the legislature's intent and refrain from either adding to or taking away from the statute's intended meaning. *Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 862-63 (Tenn. 2016) (citing *Perrin v. Gaylord Entm't Co.*, 120 S.W.3d 823, 826 (Tenn. 2003).

As noted above, in the 1998 legislative session in which the Parental Relocation Statute was adopted, the legislature had spirited debates, including commentary from a variety of interest groups, regarding alternative approaches to parental relocation. *See Hearing on H.B. 2897 before the House,* 100th Gen. Assemb. (April 16, 1998) (remarks by Rep. Bowers); *Hearing on S.B. 3141 before the Senate*, 100th Gen. Assemb. (April 16,

1998) (remarks by Sen. Henry and Sen. Haynes); *Hearing on S.B. 3141 before the Senate*, 100th Gen. Assemb. (April 20, 1998) (remarks by Sen. Haynes).  The alternatives included a bill that merely listed factors for courts to consider in relocation cases, thus necessitating court action in virtually all cases in which the parties disagreed.  *See Hearing on H.B. 2897 before the House: Children and Family Affairs Committee*, 100th Gen. Assemb. (April 1, 1998) (remarks by former Rep. Cobb).

Ultimately, the alternatives were rejected in favor of the bill enacting the current Parental Relocation Statute.  The legislative discussion of the relocation bill indicated that the intent was to ensure that children would have "the security of being with that parent that the judge thought or the parties thought was the right parent to have the child most of the time."  *Hearing on H.B. 2897 before the Children and Family Affairs House Committee*, 100th Gen. Assemb. (April 1, 1998) (remarks by former Rep. Cobb on behalf of Tennessee Bar Association).  The legislators acknowledged how hotly disputed relocation cases are and emphasized the need to reduce litigation; otherwise, one legislator commented, "Lawyers are going to win; kids are going to lose."[18]  *Id.*  He added: "[I]f the child has been with one parent, and there's nothing but the move going on, and there's a reasonable reason for the move, then we think that parent ought to be able to move."  *Id.*  These remarks are consistent with the goals referenced in the bill summary: "limiting judicial intervention in post-divorce family decision making; and making disputes easier of resolution if they must be litigated."  *See* H.B. 2701/S.B. 3126 Bill Summary, available at: http://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx?BillNumber=HB2897&ga=100.

Thus, while the legislative history indicates that the Parental Relocation Statute tipped its hat to the *Aaby* dissent by requiring the relocating parent to notify the other parent of the purpose of the proposed relocation and by making the absence of a reasonable purpose a ground for denying permission for the move, it does not indicate any intent to address the other concerns expressed in the *Aaby* dissent. Specifically, it does not support the *Webster* court's interpretation of "reasonable" as "significant" or

---

[18] The legislator explained:

> What we've got in our bill is: if there is no reasonable reason for the move, then you can litigate.  If it's vindictive, you can litigate.  If you take the child into a harmful situation, you can litigate.  And we spell out harmful situation much more broadly than the *Aaby* decision.  I won't go through all of them with you, but if you'll look at that section (d), you'll see that there's a whole list of harms.  In those situations, yes, you have to relitigate sadly.

*Hearing on H.B. 2897 before the Children and Family Affairs House Committee*, 100th Gen. Assemb. (April 1, 1998) (remarks by former Rep. Cobb on behalf of Tennessee Bar Association).

"substantial," nor does it support an approach in which the trial court weighs the purpose of the proposed relocation "against the gravity of the loss of the non-custodial parent's ability 'to participate fully in their children's lives in a more meaningful way.'" *Webster*, 2006 WL 3008019, at \*14 (quoting *Aaby*, 924 S.W.2d at 631 (White, J., dissenting)). Rather, the statutory structure[19] and legislative history both indicate an intent to make relocation cases relatively clear-cut, to permit the parent who has been spending the majority of the residential parenting time with the child to relocate with the child without court intervention, except in unusual cases in which the other parent proves that the move is vindictive, risks serious harm to the child, or has no reasonable purpose at all.

We agree with the dissent in the Court of Appeals that reliance on the *Webster* interpretation of "reasonable purpose" has at times led to anomalous results. *Aragon*, 2015 WL 7752440, at \*12 (McBrayer, J., dissenting). For example, in *Carman v. Carman*, the court held that a custodial parent who had remarried and sought to relocate to live with her new husband lacked a reasonable purpose for the move. *Carman v. Carman*, No. M2011-01265-COA-R3-CV, 2012 WL 1048600, at \*7 (Tenn. Ct. App. Mar. 26, 2012) ("On balance, [the new husband's] career, church duties, and his responsibility to his mother are not sufficient to render it unreasonable for [the new husband] to relocate to Tennessee to live with his new wife."); *see also Mackey v. Mayfield*, No. E2014-02052-COA-R3-CV, 2015 WL 5882657, at \*6 (Tenn. Ct. App. Oct. 8, 2015) (holding no reasonable purpose to relocate where custodial father sought to move with the child to live with his new wife in Wisconsin because she needed to live in Wisconsin to care for her mother); *Thorneloe v. Osborne*, No. E2012-02004-COA-R3-CV, 2013 WL 4606375, at \*4 (Tenn. Ct. App. 2013) (finding that mother's proposed relocation to Wisconsin to live with her new husband was not reasonable when "weighed against the gravity of Father's inability to participate fully in the children's lives"). In another case, an unemployed custodial parent who finally found work in New Jersey proposed relocating there with the child; this was deemed not a reasonable purpose. *See Lawrence v. Broadnax*, No. E2015-00214-COA-R3-CV, 2015 WL 10319306, at \*4 (Tenn. Ct. App. July 31, 2015).

We note that the *Webster* court's view of the term "reasonable purpose" encourages trial courts to consider evidence that has little to do with the proposed purpose of the move and more to do with the perceived overall fairness of the primary residential parent's decision to relocate or whether the move is in the child's best interest.

---

[19] In particular, the mandatory structure and compressed timeline for resolution appears intended to get relocation disputes resolved quickly. For example, a petition opposing a proposed relocation must be filed within 30 days of the receipt of the notice of relocation. Tenn. Code Ann. § 36-6-108(d)(1). The reason for this is clear. Parental relocation cases are often prompted by a time-sensitive opportunity for the custodial parent, such as a job offer. If the parent opposing relocation is permitted to unduly delay resolution, the opportunity for the custodial parent may be lost.

For example, in the case at bar, the trial court factored into its decision Mother's assertion that, because neither parent could secure employment, she accepted work abroad with the understanding that Father intended to remain in middle Tennessee after he received his nursing education, but after obtaining the benefit of their bargain, Father decided not to seek a nursing job in Tennessee.[20]  These facts would be pertinent if the trial court were charged with deciding whether Father's proposed relocation was fair to Mother; it was not, however, tasked with making that determination.  The testimony relied upon by the trial court in fact ranges far afield from an evaluation of the limited question of whether Father's stated purpose for moving to Arizona was reasonable.  The rigid structure of section 36-6-108—in which best interest is reached *only* if and when the parent opposing the move proves one of the grounds—suggests that the "reasonable purpose" ground is not intended to be a guise under which the trial court may determine whether the parent's decision to relocate is wise or fair or in the child's best interest.

Accordingly, we overrule *Webster v. Webster* insofar as it interpreted the term "reasonable purpose" in section 36-6-108 to mean "a significant purpose, substantial when weighed against the gravity of the loss of the non-custodial parent's ability to participate fully in their children's lives in a more meaningful way." *Webster*, 2006 WL 3008019, at *14.  The term "reasonable purpose" should be given its ordinary meaning.

In the case at bar, Father sought to move with Daughter to Arizona because he had secured an advantageous nursing job at a facility in Tucson where his mother had worked for some thirty years, in an area where he and Daughter would live near his parents and his extended family and have their support, and where he and Daughter would live near some of Mother's extended family as well.  Mother put on virtually no evidence showing that Father's purpose for the proposed relocation was not a reasonable one.  Under the natural and ordinary meaning of the term "reasonable purpose" as used in section 36-6-108, we must conclude that Father stated a reasonable purpose for relocating to Arizona with Daughter and Mother did not carry her burden of establishing a ground for denying Father permission to relocate.  On this basis, we reverse the holding of the trial court and the Court of Appeals that Father had no reasonable purpose for the proposed relocation.

Under the Parental Relocation Statute, "[t]he parent spending the greater amount of time with the child *shall be permitted* to relocate with the child unless the court finds" that the parent opposing the relocation has proven one of the enumerated grounds. Tenn. Code Ann. § 36-6-108(d)(1) (emphasis added).  The best interest of the child is addressed

---

[20] Interestingly, Mother's testimony indicated that *she* might not continue to live in the Clarksville area; she was considering job offers in Washington, D.C., and was also considering relocating to either New Hampshire or North Carolina, where her other daughter's father lived and where her new boyfriend expected to be stationed.

*only* if the parent opposing relocation proves a ground for denying the relocating parent permission to move with the child, so our holding on reasonable purpose pretermits the question of best interest in this case. *See* Tenn. Code Ann. § 36-6-108(e); *Kawatra*, 182 S.W.3d at 802. Accordingly, as mandated by the statute, we reverse the trial court's denial of permission for Father to relocate to Tucson with Daughter, and we also reverse the trial court's modification of the parties' parenting plan to designate Mother as the primary residential parent.

While these holdings are required under the rigid structure of section 36-6-108, we recognize that Mother has served as Daughter's primary residential parent since August 2012 while the various appeals in this case have been pending. "Real world complexity steals into the equation when we consider, as we must, that events and lives have not stood still while this custody dispute has been in the courts." *Gorski*, 999 WL 511451, at *4. Therefore, on remand, the trial court is authorized to fashion an appropriate transitional parenting plan that results, within a reasonable time, in designating Father as primary residential parent and permitting him to live in Arizona with Daughter, consistent with this Opinion.

## CONCLUSION

In conclusion, we overrule the Court of Appeals' decision in *Webster v. Webster*, No. W2005-01288-COA-R3CV, 2006 WL 3008019 (Tenn. Ct. App. Oct. 24, 2006) insofar as it interpreted the term "reasonable purpose" in section 36-6-108 to mean "a significant purpose, substantial when weighed against the gravity of the loss of the non-custodial parent's ability to participate fully in their children's lives in a more meaningful way." *Id.* at *14. Under the natural and ordinary meaning of the term "reasonable purpose" as used in section 36-6-108, we hold that Father stated a reasonable purpose for relocating to Arizona with the parties' child and Mother did not carry her burden of establishing a ground for denying Father permission to relocate with the child. On this basis, we reverse the holding of the trial court and the Court of Appeals that Father had no reasonable purpose for the proposed relocation. Under section 36-6-108, "[t]he parent spending the greater amount of time with the child *shall be permitted* to relocate with the child unless the court finds" that the parent opposing the relocation has proven one of the enumerated grounds. Tenn. Code Ann. § 36-6-108(d)(1). Therefore, pursuant to the mandate of the statute, because Mother has not proven a ground to deny permission to relocate, we also reverse the trial court's denial of permission for Father to relocate to Tucson with Daughter, and we reverse the trial court's modification of the parties' parenting plan to designate Mother as the primary residential parent. On remand, the trial court is authorized to fashion an appropriate transitional parenting plan that results, within a reasonable time, in designating Father as primary residential parent and permitting him to live in Arizona with Daughter.

Accordingly, we reverse the Court of Appeals and the trial court and remand the case for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellee Cassidy Lynne Aragon, for which execution may issue, if necessary.

_____
HOLLY KIRBY, JUSTICE