

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs February 2, 2017

## JESSICA MARCEL BROADNAX v. QUENTIN ELLIOTT LAWRENCE

**Appeal from the Circuit Court for Hamilton County**
**No. 11D698      J.B. Bennett, Judge**

---

**No. E2016-01176-COA-R3-CV**

---

This case is again before this Court after being remanded to the Circuit Court for Hamilton County ("the Trial Court") for a determination of whether it was in the best interest of the parties' minor child ("the Child") to relocate to New Jersey with Jessica Marcel Broadnax ("Mother"). Mother appeals the Trial Court's May 5, 2016 order upon remand, which found, *inter alia*, that it was in the best interest of the Child to remain with Quentin Elliott Lawrence ("Father") and not to move with Mother to New Jersey. We find and hold that the evidence in the record on appeal does not preponderate against the Trial Court's findings. Finding no error on the part of the Trial Court, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

Charles G. Wright, Jr., Chattanooga, Tennessee, for the appellant, Jessica Marcel Broadnax.

Jillyn O'Shaughnessy, Chattanooga, Tennessee, for the appellee, Quentin Elliott Lawrence.

# OPINION

## Background

Mother and Father were divorced in 2012. Their divorce decree incorporated a parenting plan for the Child designating Mother as the primary residential parent and granting Father 104 days of co-parenting time per year. In October of 2014, Mother provided Father with a notice of intent to re-locate to Pennsylvania for a possible employment opportunity. She later amended her notice to include New Jersey as another possible place for relocation based upon another employment opportunity. Father opposed the proposed relocation.

The case was tried, and the Trial Court entered its order finding, *inter alia*, that Mother's proposed relocation was not for a reasonable purpose. Mother appealed to this Court. By Opinion filed on July 31, 2015, this Court affirmed the Trial Court's "determination that Mother's purpose for relocating was unreasonable . . ." and held that the Trial Court had failed to make a comprehensive best interest analysis pursuant to Tenn. Code Ann. § 36-6-108(e). *Lawrence v. Broadnax*, E2015-00214-COA-R3-CV, 2015 WL 10319306, at **7-8 (Tenn. Ct. App. July 31, 2015), *no appl. perm. appeal filed* ("*Lawrence v. Broadnax I*"). We remanded the case to the Trial Court to make a determination about the Child's best interest in compliance with Tenn. Code Ann. § 36-6-108(e). *Id*. at *8.

While *Lawrence v. Broadnax I* was pending in this Court, Mother relocated to New Jersey and left the Child in the care of her parents in Chattanooga. Father eventually discovered that Mother had relocated to New Jersey. Father filed a petition for an emergency order seeking, among other things, entry of a temporary order granting Father custody of the Child. The Trial Court entered an ex parte Temporary Order on February 10, 2015 ("Temporary Order"), *inter alia*, granting Father primary custody of the Child.

In December of 2015, after we remanded the case to the Trial Court in *Lawrence v. Broadnax I*, a hearing was held, and the parties began to present evidence with regard to the best interest of the Child. Court was recessed prior to the close of proof. Before the hearing could be resumed, the Trial Court Judge, W. Neil Thomas, III, recused himself from the case, and the case was reassigned to Judge J.B. Bennett.

A hearing was held before Judge Bennett, and the parties were instructed to present any and all proof with regard to the issue of best interest to allow the Trial Court to make necessary credibility determinations and findings in compliance with this Court's Opinion in *Lawrence v. Broadnax I*. The hearing before Judge Bennett was held in April

of 2016.  The Child was six years old at the time of the hearing and had lived with Father since entry of the February 10, 2015 Temporary Order granting Father custody.

By way of background, Father and Mother were married in 2004, and the Child was born in 2009.  At that time, the parties were living in Texas.  Father testified that Mother moved from Texas to Chattanooga with the Child in October of 2010, and Father remained in Texas for approximately five more months.  Father then moved to Atlanta to be closer to the Child.  The parties were divorced in 2012.  When the Child was approximately four years old, Father moved to Chattanooga.  In 2014, Mother provided Father with notice of her intent to relocate, as discussed above.

Father testified that after the Trial Court entered its opinion in January of 2015 finding that Mother's proposed relocation was not for a reasonable purpose, Father attempted to contact Mother to find out if she was staying in Chattanooga or moving to New Jersey.  Mother did not respond to Father's inquiries.  Father also tried to talk to Mother's mother and received no response.  Father did not know where the Child was at that time.  Mother had moved to New Jersey, and although she had primary custody, she had relinquished actual physical custody of the Child.  Mother left the Child with her parents when she moved, and never notified Father that she did so.  Father testified that after he found out that Mother had moved to New Jersey and the Child was staying with Mother's parents, he asked for an ex parte order granting him custody.  Father testified that after entry of the Temporary Order granting Father custody, Mother contacted Father and called him "satanic" and "evil."

Father has a bachelor's degree in business administration with a concentration in finance.  He testified that he worked at BlueCross-BlueShield in customer service upon leaving college.  Father then decided to go to seminary, and he left his job to move to Dallas to attend seminary.  While attending seminary, Father worked as a bookkeeper and then as an adjuster at an insurance company.  Father testified that "[b]ecause of the rigor of the work there due to the hours . . ." he changed jobs to work at UPS, which was more flexible.  Shortly after that, Father began working at Wells Fargo in financial services for "more money."  Father stated that he made these choices in order to provide for himself and Mother, who was in school at that time.  Father stated: "every job that I've taken, it has been typically in financial services, with no - - really any gaps there, and actually moving up and making a higher wage rate."  Father testified that he never has been fired from a job.

Father stated that the only time he took a pay cut was when he moved from Dallas to Atlanta to be closer to the Child after the parties had separated and was paid $5,000 less for the same position as a banker.  Father explained that Mother had moved with the Child from Dallas to Chattanooga when the Child was approximately one year old, and

3

Father had remained in Dallas until his move to Atlanta. At that time, Father was working at Wells Fargo, and there were no branches of Wells Fargo in Chattanooga to which Father could transfer.

Father moved to Chattanooga when the Child was approximately four years old. Father testified that he was able to obtain a position as an assistant branch manager for SunTrust in Chattanooga with an increase in pay. Father testified that he is an assistant vice-president and branch manager for SunTrust Bank. He makes $60,000 in base salary and receives bonuses. Father started this job in November of 2015. The most recent bonus Father received was for the last quarter of 2015, and was "a little over" $750. Bonuses for subsequent quarters had not yet been determined. Father anticipates remaining in this employment. Father testified that his gross income for 2015 was $49,297. He explained that this includes the income from his previous job and the income from his current job, which he started in November of 2015.

Father testified that when he and Mother were married in 2004, Mother had difficulty finding a job. Mother had just graduated from college at that time. Mother's first job after college was with a non-profit, and Father testified that she only worked there for a few months because "she got into a verbal altercation with her supervisor at that time." Father testified that Mother obtained another job and "basically the same thing happened." Father testified that this happened "repeatedly" and that Mother had "verbal conflicts." He testified that Mother had told him "about three occasions where she had basically left jobs where they either told her they were getting rid of her or that she needs to think about going somewhere else." Father testified that Mother has not kept him apprised about her employment situations.

Father was asked about violence by Mother, and he stated:

[T]he whole issue with where the divorce came in and everything, when my son was barely one year old, we were at a restaurant called the Black-Eyed Pea, in Dallas, Texas, and I remember it clear as day, August 31st, 2014, maybe August 30th, but it was a Sunday - - not 2014, but 2010. We were there, and [the Child] leaned over and bit her. You know, I didn't think anything about it. He was teething. And she snapped. She was like, I can't believe he bit me. I'm going to bite him back, I'm going to bite him back. And I'm like, what are you talking about? You know, at first I thought she was kidding, but she was serious. And I said, [Mother], let's think about this. He's one, he's teething. Plus, if you bite him, you will go to jail. Don't do that. You know, I'm just kind of thinking it through and I'm like, where is this coming from? So we left the restaurant. I'm still a little confused. So while we're all in the car, I called her mother and I said, can

4

you please talk to your daughter?  Somehow or another she's flipping out because [the Child] bit her and she's talking about biting him back. . . .  But, long story short, though, she had a conversation with her mom.  We finally get back to our apartment at that time, she went in one room and undressed, undressed [the Child] changed her clothes.  Now, remember this is us coming from lunch after coming from church, and so by that time I'm like, okay, I'm getting ready to deal with this, so I said, you know what, I said, I'm going to step out for a second.  I get to the door and I hear a loud slap (witness claps his hands), and he starts crying.  I run back to the room, she has him by the face telling him, don't you ever bite your mother.

> And I said, [Mother], you need to give me our son and you need to just relax.  No, you're not going to take him from me.  I had to physically restrain her and hold her down, and I had to tell her, you're not going to do anything else to him.  She finally gave [the Child] back to me, and I called the police because at that time I was like, I don't even know where to even go from here.  I still have the 911 tape and everything where I called them.  They came there, I told them my story, she told them whatever she told them, and before I knew it, I was being taken to jail.

Mother has referred to this incident as one wherein she obtained an order of protection. Father was asked if a hearing was held, and he stated: "No.  It was completely thrown out. . . .  And the whole matter has even been expunged, even the arrest, . . . ."

Father testified about when Mother had primary custody of the Child.  Father testified that when he would pick the Child up for his parenting time the Child would be dressed in clothing "too little for him" and "[h]is hair wouldn't be brushed or cut." Father was asked if he paid child support during the time when Mother was the primary residential parent, and he stated: "Yes, I did.  I actually paid money even beforehand, as well."

Father testified that he has provided for the Child's health care since birth.  Father was asked if the Child had any health issues during the time that Mother had primary custody, and he stated:

> It was horrible.  There would be multiple times when I did get [the Child], when she would drop him off he would be sick, have a cold, congested.  She dropped him off one time and he had strep throat, and had no indication of it, no fair warning.  And like I said, I spend a lot of time with my mother, and my mother has rheumatoid arthritis, so her immune system is already weak from all the medication she takes.  She's fine, but, you

5

know, that exposes her, too, and then let alone exposes me, also. So I wouldn't have minded a heads-up.

There was a time, and this was when he was - - this was actually before the divorce was finalized and everything, I think the separation had been recent, but during Christmas when I got him, he wasn't eating. And we were trying to find out, well, what the devil is going on. And come to find out - - and they finally contacted us and let us know that, oh, well, [the Child] had thrush and you may want to take him to the doctor. And I'm thinking, you had him all day, all day, and this child did not eat, and you did not take him somewhere to get the medication for it. So we had to stop our Christmas plans and - - I mean we had all of our family, which is fine, that's fine - - but we stopped everything. I took him to the emergency room, they checked him out, simple prescription, got him the medicine, that was it. But, you know, any parent that knows about a child having thrush - - because he had it before when [Mother] and I were together. It's painful. A child's not going to eat because of the friction across the tongue and in the mouth, it's painful. And so he was real whiny, real mopey, and that's when I knew something was wrong. And when I asked, you know, well, he has thrush, he's had it all day, you might need to take him to the hospital.

Father testified there also were times when the Child had medications, and Mother did not provide them. So Father would have to go pick up the medication. Father stated: "if he's got medication, I want to give it to him at the right time and make sure that he stays on the schedule."

Father testified that when Mother was the primary residential parent Father was supposed to have the Child every other weekend and have phone calls with the Child. Father stated:

I was also supposed to speak to him at least two times each week. Those occasions were very rare. I typically would not speak to him - - it wouldn't be, you know, every week, it would usually be about three weeks, maybe, sometimes a month before I would even speak to my son. I'd get interrupted. Many times there would be like pots and pans banging in the background, or the phone would disconnect, or the phone would be muted. And so there were a lot of distractions, a lot of interruptions. There were times he'd come back on the phone crying, and then I'd find out later that his mother had spanked him for him talking about, you know, something that they were doing there at home. When I would see him, you know, we had a great time.

6

Father testified that he would read books to the Child when he would see him, they would visit museums or go to the park, or watch cartoons together. Father testified they also would spend time with Father's mother and sister and on Sundays would go to Father's grandmother's house to visit.

Father testified that when Mother had primary custody if she needed child care and called Father's mother then Father's mother would cancel any plans she had to take care of the Child. Father stated that his mother has "been there every step of the way" and that he could not recall a time when his mother refused to care for the Child.

Father testified about an incident that occurred when the Child was attending daycare. Father was scheduled to pick the Child up one day and was running a little bit late due to a meeting that ran late. Father contacted the daycare to let them know he was on his way. When Father arrived, Mother was leaving the daycare with the Child. Father stated:

> I said, well, I said, I'm already here, let me go ahead and get [the Child], you know, we'll go ahead and leave. And when I reached for him, she snatched him away and she said, don't touch me, you don't touch my son and you don't touch me or I'm calling the police. And I said, I'm here to pick up [the Child], this is what was agreed to. And she was belligerent. And she was doing this, now, while she has him in her arms. And this isn't the first time that she's been somewhat violent with him. But I'm like, just give me my son so that we can go and let's keep it moving, you know. And after a minute or two of just trying to reason, you know, finally got him, she put him down and walked on, I put him in the car, and we got out of Dodge.

Father stated that interactions with Mother during drop-offs and pick-ups have "never really been peaceful." Father was asked how he reacts, and he stated:

> I try to back off. You know, I've been here before dealing with her and her temper and then trying to turn the tables and put me in some situation like I'm - - . . . . But no, it's  - - my thing is to try to avoid it. I don't like conflict. I try to reason through things. I'm not going to lie. I do get upset, seriously upset, because it involves my son. But I'm nobody's fool, either. I'm not going to sit up here and just go back and forth with you on things. Drama is not something that I thrive on.

According to Father, when it was time for the Child to begin kindergarten Father attempted to talk to Mother about where the Child would attend school, and "she either

7

would not respond or she would say, it's none of your business, I'm going to make the decision." Father was not satisfied with the choice of school because the school Mother chose was a new charter school without a proven record, and Father had "already heard rumors about issues that were there."

Mother had primary residential custody from the Child's first day of school in kindergarten until February of 2015. Mother moved to New Jersey in January of 2015. The Child's kindergarten report card was introduced as an exhibit, and it shows that the Child's grades went up in several areas during the third and fourth quarters of kindergarten when Father had custody as compared to the first two quarters during which Mother had primary custody.

Father testified that the Child now was in the first grade. After Father gained custody of the Child, he enrolled the Child in a different school from where the Child had attended kindergarten. Father testified that he made the decision to change schools. Father stated that the new school is the school that the Child is zoned for, and that neither Father nor Mother lived near the school where the Child had attended kindergarten.

Father testified that the Child is doing "exceptionally well" in school and is "reading well above reading level." Father hopes eventually to send the Child to private school because "it's clear that he's very intellingent and he needs to be somewhere where he can be challenged appropriately." When asked about the Child's extracurricular activities, Father stated that the Child was in Bible club at school. Father hopes to incorporate some sports activity in the future.

Father testified that the majority of Mother's family, including Mother's mother and father, her two sisters and a brother, her great aunt, her sister's children and her brother's children, reside in Chattanooga. Father stated that Mother also has some extended family in Atlanta and in Alabama. Father testified that the Child has a good relationship with Mother's family. Father was asked if during the time he has known Mother they ever had visited any of Mother's family in D.C., New Jersey, or New York, and he stated:

> No. I knew that she had an uncle that at one time lived somewhere in the D.C. area. But as far as Trenton, New Jersey, New York, Philadelphia, out of the - - I'll say the 16 years now that I've known [Mother], and having been married to her for seven years, there was never, ever any mention of any family that was in Philadelphia, or Trenton, New Jersey, or anywhere else on the East Coast, except for the one uncle that I knew of that lives somewhere in D.C.

8

Father testified that after he was granted custody of the Child:

> I made it very clear to her family up front, I said, I know that [Mother's] in New Jersey. I said, you-all are welcome to pick up the parenting plan from there, you can have those times with him. I made that clear. I've made that clear since February 2015 even up until now.

Father stated that Mother's family has not taken him up on this offer except for a few times. Father stated that a "big reason" why he thinks the Child should remain in Chattanooga is "because he needs both of his families in his life." Father stated that his relationship with Mother's family is better than his relationship with Mother. Father testified that other than allowing other family members to watch the Child he never has needed to hire a babysitter.

Father attends church and takes the Child to church. Father stated that he attends the same church that he has attended since he got primary custody of the Child. Father was asked if the teachings of his church were consistent with the teachings of the church that the Child had attended with Mother's father, and he stated: "Yes. Denominationally, they're different. They're at a Baptist church, we're at a Presbyterian church. But as far as the fundamental tenets of what we believe, yes."

Father has not witnessed Mother physically punishing the Child, but he stated that he has seen fingernail marks on the Child "from where she's pinched him." Father was asked if he uses physical punishment with the Child, and he stated:

> Very rarely. I will sometimes pop him on the hand or on the bottom. But with him, like I said, he's such an intelligent child, a lot of times you can reason with him. Even with him, I tell him, you know, just tell me what happened, what was the situation, and we'll go from there. And when he tells me that, you know, yeah, I - - . . . . But if he says something - - if he tells me the truth about a matter, I'm like, okay, well that's fine, I said, let's pray about it, and you're forgiven because you were honest with me about it. And probably nine times out of ten that's typically how it goes.

Father testified that he does not talk about Mother in a negative way with the Child. Father stated that he tells the Child "regardless of Mommy and Daddy being separated, we're both going to be in agreement on you not doing the wrong thing, if it's saying the wrong thing or doing something that you're not supposed to." Father stated that there have been times when Mother has asked him to speak to the Child about behavior, and Father stated that he would tell the Child "you need to obey your mother." Father stated that he has "never in any way diminished her right as an authority figure in

his life when it came to disciplining him for anything that he's done wrong. If anything, I've supported it, encouraged it." Father stated that he has spoken positively about Mother to the Child, and stated:

> I make it very clear to him that his mother loves him when concerns have been raised by him about seeing his mother, and I tell him, well, your mommy loves you. And I have to tell him, you know, she may not be here, but your mommy's working, she's in New Jersey working, when she can come here, she'll be here, you'll get to see her. I've even had to tell him, though - - because for some reason he has in his mind that I'm not letting him see his mother, and I'll let him know that, son, you can go anytime that your mommy wants you to go up there to visit, I don't have a problem with that. My whole thing is I want him to have more time with her, I want him to see her, I want him to have more time with her, because, again, the whole point of the matter of him staying here in Chattanooga is because all of his family's here.

Father testified that the parenting plan entered in February of 2015 along with the Temporary Order provided for Mother to have phone calls with the Child two times per week. Father stated that he agreed to a third day and told Mother she could call on Tuesdays, Thursdays, and Sundays. Father based these days on his work schedule and the Child's schedule when he knew the Child could talk and when the Child's homework was taken care of or the Child had time to complete it. Father was asked how he came up with the times for phone calls, and he stated:

> I based those - - Tuesday and Thursday was based off of the times that I was supposed to have when [Mother] was the custodial parent, and so when I got him I asked and it was said that yes, we'll keep those times. And then I also threw in Sunday as well because I knew that, you know, being in New Jersey like that, you know, he might as well have an additional day where he can talk with her.

Father stated that he and Mother intially agreed to those days for phone calls. He stated that as time went on Mother wasn't calling on those days and "[t]here were times where she went two weeks without speaking to [the Child]." Father stated that Mother then began "calling at different odd times, may call on a Monday at random, or Wednesday, or Friday." Father told Mother that the Child needed some structure and consistency, and Mother responded that she could call anytime she wanted and that Father could not tell Mother when she could speak to the Child.

10

Father explained that the Child uses Father's cell phone to talk to Mother, and Father set the times for when he knew that his schedule would accommodate allowing the Child to talk on Father's cell phone. Father stated that when the Child is talking to Mother, Father usually leaves the room. Father stated that he refrains from asking the Child what he and Mother spoke about. Father stated: "[the Child] is six, he's still a very young child, but he will form his own opinion of both me and his mother based on his own interactions with us. And if anything has happened in conversation or otherwise with her, at some point it will come to light."

Father testified that after he was granted custody in February of 2015, other than summer and spring break, Mother has exercised parenting time during her weekends five or fewer times. Mother exercised her parenting time during Christmas in Chattanooga, and Father stated that she got some additional time with the Child. Mother came to Chattanooga during the week after the Child's spring break. This time was not Mother's scheduled time under the parenting plan, but Father allowed her to spend time with the Child. Mother did not request to see the Child during the Child's spring break, which is scheduled as Mother's time under the parenting plan. Father testified that he and Mother split the summer as per the parenting plan. Mother had the end of the summer and was supposed to return the Child to Father at the end of July. During the time that Mother had the Child, Father would attempt to call during the times provided for in the plan and often was unable to speak to the Child.

Father testified that this Court's Opinion in *Lawrence v. Broadnax I* was released during the summer while Mother was exercising parenting time, and Mother mistakenly seemed to think that she now had primary custody of the Child. Father explained that he had allowed Mother to have the Child longer because Mother's sister was getting married. Initially, Mother was to return the Child to Father at the end of July. Father agreed to give Mother extra time with the Child because Mother's sister was getting married in Chattanooga on August 8th. The Child's school was scheduled to begin on August 13th. On August 9th, after the wedding, Mother flew with the Child back to New Jersey. Father testified that he feared that he "was never going to see him again," and after futilely calling and sending e-mails he had "to shuffle around and beg and then threaten with a police report for kidnapping to let them know that if I don't get my child back, somebody's going to jail." The Child finally was returned to Father on the day before school began "at almost 10:00 that night." Father stated that the Child had had "to catch planes" and "get on a Megabus" in order to return to Chattanooga. The Child had to fly to Denver and then ended up in Atlanta and took the bus from Atlanta to Chattanooga. Father testified that the Child flew with one of Mother's uncles who lives in Atlanta.

Father is concerned that if Mother is allowed to move with the Child to New Jersey that Father would not have the time to speak with the Child on the phone as allowed in the parenting plan because "[i]t didn't happen before, when I was in closer proximity to him, when I moved all the way from Dallas to Atlanta and then even moved back here, so there's no reason to believe, based on her past behavior, that it's going to change." With regard to seeing the Child in person, Father stated: "nobody's going to be flying back and forth to New Jersey, you know, once a week, two times a week, or however often. So I know that I won't see him as much as I - - as would be mandated, I just wouldn't." Father testified that even before February of 2015, Mother did not comply with the parenting plan.

Father has concerns about Mother's desire to stay in New Jersey based upon things he has heard from Mother. Father has tried to ask Mother if she currently is employed. He stated that Mother's response was "pretty much an answer basically saying to stay out of my business." Father testified that Mother was not employed from August through December of 2015, and that she did not request to see the Child during that time. Father testified that he never has denied any request Mother has made for parenting time. Mother requested additional time during Christmas break, and Father stated that he "referred her to the parenting plan, and I said that the parenting plan provided sufficient time initially. But she still got to spend more time with him."

Father testified that Mother sent him text messages about the Trial Court. Father stated:

> She stated that - - that the ex parte order that had been entered was illegal, and that basically you and Judge Thomas, who was the then-presiding judge over things, that somehow or another you-all were in cahoots. And she mentioned the fact that Judge Thomas was an alcoholic judge. And yeah, she kind of went from there. And, you know, over the last 16 years of knowing [Mother], by this time I shouldn't be surprised by anything that comes across, but when she sent that text back to me, even I was speechless then.

The parenting plan is temporary, but Father believes that if Mother decides to remain in New Jersey the plan should become permanent. Father has not asked Mother for child support and Mother has not provided any child support.

Father was asked why he thinks it is in the Child's best interest to remain with him, and he stated:

The main thing is that [the Child] needs to be with his family, and not just my family, but her family as well. He has no one else up in New Jersey or Philadelphia or anywhere else that has been thrown out there. All of his family is located primarily in Chattanooga, and if not Chattanooga, they're somewhere in the southeast, within reasonable driving distance.

Second of all, again, [Mother], her employment record is such to where it - - it gives me pause to think that she's going to be able to provide sufficiently for him if she's jumping from job to job. And especially recently, now, with having the long gap from August to December, my question is - - yeah, she's an educator, as Mr. Wright brought up, but where are you working at? And if you're a teacher, and if there are these abundance of jobs out there, why aren't you doing that, and what happened to keep you from being employed? My son doesn't need to be somewhere where - - where there's financial insecurity there, and instability.

So the fact that his family is here, the issues with employment and reasonable financial stability and security, also, too, my concerns about her with her - - with her mental state, when it comes to her being violent at times. Like I said, I'm not here to, you know, besmirch her character or anything, these are just legitimate concerns from things I've seen over time.

I have concerns with her being in an isolated place, away from family and help and other people that know her, love her, care about her and my son, to help her. Being there by herself - - and I could care less about any friends that she's made up there, they're not family, and they're not people that know her and know him. And to be isolated like that, with the issues like she's had before with how she's disciplined him, supposedly, and even just her behavior towards me, that's scary.

So those are my main three things right there why it's in his best interest to be here. Because, again, I'm not trying to take [the Child] from her, but I am trying to make sure that his network of family and friends and people who've invested in his life, that it stays intact.

Marsh Lawrence ("Grandfather"), Father's father, testified. He described Father as "a very loving, patient father." Grandfather sees the Child typically two or three times per week. He explained that on Sundays the family, including his sisters, his niece, nephew, and great nephew, gather at his mother's, Father's grandmother's, house. When asked about the Child's relationship with this extended family, Grandfather stated: "he loves them." Grandfather testified that prior to Mother moving to New Jersey she would

13

call him if she needed a babysitter, and Grandfather would babysit. Grandfather never charged Mother for babysitting the Child. Grandfather acknowledged that when Mother lived in Chattanooga in 2010, she allowed Grandfather to visit with the Child on a consistent basis.

Grandfather was asked if Father speaks negatively about Mother in front of the Child, and he stated: "Oh, no. I mean, at least in front of me, he always tells him to respect his mother. And, you know, if - - if he thinks he's been punished unfairly or, you know, whatever, [Father] will tell him that his mother, you know, whatever she did was fair."

Grandfather stated that the Child is a happy child, "is very curious" and "likes to cuddle up." When asked what other types of affection he has witnessed between Father and the Child, Grandfather stated:

> Well, I mean, other than mutual respect, you know, he's his dad. And, you know, even if [Father] has to, you know, tell him about something that he's doing wrong, you know, he's respectful, you know, yes, sir. And, you know, he's teaching him how to be honest, you know, if you do something wrong or you tell a lie, if you come to me and you tell me, he said you're forgiven, but, you know, just tell the truth.

Syletta Broadnax Edwards, Mother's sister, testified. Ms. Edwards is a social worker for DCS. Ms. Edwards testified that the Child has a close relationship with her son who is 16 years old. She stated that the Child "calls him his brother." Ms. Edwards testified that the Child:

> loves his mother. They have a bond, just like a child and a mom. Of course, she has rules and structure. And of course, as a boy, sometimes boys don't follow that. They love to test their mother. But in the same breath, they have a - - they have a good bond.

Ms. Edwards testified about a problem that occurred after entry of the Temporary Order granting Father custody of the Child. She stated that Mother attempted to pick the Child up at school, but that the school would not release the Child to Mother because Mother was not on the list. Ms. Edwards went to the school, and Father was called. Ms. Edwards stated that the situation was straightened out, and Mother eventually was allowed to take the Child.

Ms. Edwards testified that she texted Father in September asking if she could have the Child for a weekend visit, and Father responded that he would "get back with [her],"

14

but did not do so until four days later. Father told Ms. Edwards that he had been busy. Ms. Edwards acknowledged that Father did allow her to have the Child on that occasion. When questioned further, Ms. Edwards agreed that she initially had texted Father on September 3rd asking to have the Child for a visit on the weekend of September 25th, and that Father responded to her on September 8th granting her permission.

Ms. Edwards testified about another occasion when she wanted to pick the Child up at school to take him to see his cousin play basketball, and Father told her that he would allow her to pick the Child up. Ms. Edwards stated:

> [A]t that time I guess it just rubbed me the wrong way because he was like, I'm going to allow you to get him. And I wasn't comfortable with allowing me because I felt like, as his family, we should all be on the school list, it shouldn't be an issue. Because my mother had an issue previously, the last month she couldn't get him, they had to call him. . . . So I feel like, as a family, all his family member should be on the list, it shouldn't be an issue when that time come to get him out of school. We're not strangers.

Ms. Edwards stated that the Child "loves both his parents. And [the Child], I'm like a second mother. He talks to me a lot. He loves his mother. He misses his mother." When asked if she had concerns about the Child remaining with Father, Ms. Edwards stated: "I can't really answer that. I know when I pick up [the Child], I mean, he looks like he's taken care of. I don't know, you know, the extent of his activities of daily living with his dad - - . . . so I can't really say I have concerns because I don't - - me and [Father are] not close."

Ms. Edwards was asked if Mother had a quick temper, and she stated: "I wouldn't say that, because she works with kids. You've got to have a type of character and personality when you're dealing with children. So I would say no, she doesn't have a quick temper." Ms. Edwards was asked if Mother had a quick temper with Ms. Edwards, and she stated: "We're sisters. . . . That's family. . . . We all do when it comes to family."

Tonya Broadnax Whaley, Mother's sister, testified. Ms. Whaley is a Case Manager 3 for Joe Johnson[1]. Ms. Whaley was asked if she observed anything about the Child that concerned her, and she stated: "That's why I should have brought my tape recorder, because I recorded and he didn't know, him acting out why he - - why was his mama leaving him and stuff. Had I known that I needed to bring it today, I would have

---

[1] There was no proof in the record on appeal as to what Joe Johnson is.

15

brought the tape recorder. It was very hurtful the way he responded when his mama got ready to go."

Ms. Whaley testified that she had wanted to call the Child, and Father told her that she had to call on a Tuesday or Thursday around 7:30 because "his work schedule, that school schedule is hectic any other days of the week . . . ." Ms. Whaley stated that she did not understand why she could not call her nephew anytime to check on him and wish him a goodnight. She testified that Father said "if you want to just say goodnight to him before he goes to bed, that's fine. . . . [O]therwise, the schedule, it is what it is." Ms. Whaley acknowledged that Father has allowed her to talk to the Child and has allowed her to pick the Child up from school.

Ms. Whaley was asked if Father had ever denied her requests to visit the Child and she stated: "No. I was just denied the phone call. I wasn't denied the visitation." She admitted that on one occasion when she had texted Father to have the Child call her, and Father had responded that the next day would be better, Father did wind up having the Child call her on the same day of the text. Ms. Whaley stated: "Yeah, after I responded to [Father] the way I did."

Ms. Whaley was asked if she had concerns about how Mother parents the Child, and she stated:

> No, sir, I don't, because, honestly, he loves both of his parents. But he has a - - a mother and son bond with his mom, because that's who he always been with. Because at that time the daddy lived in Atlanta, the daddy lived in Texas. He lived all around the world. He just recently, before y'all gave him custody, moved to Chattanooga. That's why it was so confusing how he move here and then take the son.

Ms. Whaley was asked if she had discussed with Mother why Mother has not moved back to Chattanooga, and she stated:

> I can answer that. I have a master's degree, and it is - - it's not a lot of opportunities here for educated people as far as job-wise, as far as the money. They don't pay educated, college-degree people a lot of money here. And I can vouch for that. Being gone 20-something years, I have looked for all kind of jobs. I have master's degree, a Case Manager 3, and I make under $30,000 a year here in Chattanooga.

16

Sarah Broadnax ("Grandmother"), Mother's mother, testified. Grandmother is a retired guidance counselor who works as a college advisor for the Public Ed Foundation and the Hamilton County School System.

Grandmother was asked about Mother's relationship with the Child, and she stated:

> They've had a good relationship. She moved back here when he was approximately ten months old, and they lived with us for approximately two years or longer, until she moved out on her own - - . . . and got a house, until she - - she left here. She interacts with him. She teaches him. When he was a baby, I bought him the My Baby Can Read, and he started reading and pronouncing words when he was still like one or two years old. So she takes up a lot of time with him, she interacts with him, yeah.

Grandmother was asked if she had seen Father send money to support the Child during the time that the Child lived with her. Grandmother stated: "when the baby came to live with us at ten months old, there was nothing coming into the child until like about a year or two later he started sending $100 here and $150 here. . . . He started sending something later, he would send something, but child support never came or started until once the divorce were finalized."

Grandmother testified that when Mother and the Child first moved in with them:

> [The Child], he wasn't even walking at that time. He was in a walker. And he was traumatic (sic) at that time, crawling, and when - - you know how you call someone from another room to come? I notice when you would scream or holler, he would crawl in a corner and get behind the door. And she would cry all the time, so there was a lot of adjusting emotionally and socially to the move, to the transition.

Grandmother testified that Mother moved to New Jersey after the initial relocation hearing. She stated that Mother "took the job under the advisement of the lawyer to show that she was established and that she actually had the job, although it was on paper she had the job and the salary and all." Grandmother testified that Father continued to get his every other weekend visitation pursuant to the parenting plan. Grandmother testified that she thought Father knew that the Child was living with them "because he talks to [the Child], [the Child] tell him everything. All you got to do is ask [the Child] anything, he'll respond to it." Grandmother stated that after Mother moved to New Jersey, the Child lived with them for a little over a month, which was through the middle of February.

17

Grandmother tries to see the Child once a month. She testified that it is difficult for her because she is the caregiver for her mother who has Alzheimer's and is on hospice at her home. Grandmother stated that Father:

> initiates a lot of times for me to get [the Child]. He'll say, can you get [the Child], or would someone in the family like to get [the Child] this weekend? And sometimes I e-mail him back - - text him back and say I can get him Saturday. And he'll say, what's wrong with Friday, why not Friday? Then I know he must have something planned. Then I have to work it out and, you know, get it taken care of. . . . Sometimes I'll get him - - my daughter will ask for him and get him, yeah.

Grandmother testified that after she learned that the Child attended the school next to the school where she works, she asked Father if she could pick the Child up at school. Father agreed that Grandmother could pick the Child up at school. Grandmother testified about an occasion wherein she had a problem picking the Child up at school stating:

> I told them I came to pick up [the Child]. And they - - you could tell there was nervousness there. And they said, let me see your ID. . . . I showed them the ID, and they looked at each other and they said, what's your name? I said, is there a problem me getting my grandson? They said, no, then they got on the phone, and I guess they were making sure it was okay. That kind of bothered me. . . . [B]eing a grandparent, at the school next door, I would assume I could pick up my grandchild without going through all that red tape.

Grandmother stated that she "should be able and free to pick [the Child] up if necessary."

Grandmother was asked if she had observed any controlling or anger issues with Father, and she stated:

> [Father] is very controlling. That's not speculation. That's what I know. Even in my dealing with him, when you ask him a question, he can't just answer your question. I get a text message like a book until I respond I'm not answering that message, I'm not texting you anymore. You know, I guess that's the way he makes his point, by going on and on and on and on and on and on and on. . . . I've seen him out of control. He came over one day to - - was it to get [the Child] - - to get [the Child], and [Mother] was there. He didn't know we were there because the car was not there. So she takes him to the door, and I could hear him screaming and hollering.

18

And my husband went out there. My husband's a very quiet person, doesn't talk very much, but that day he told him to get out of his garage, get out of his garage, he told him to leave. My husband - - they haven't had any contact since my husband went and got [the Child], went and got [Mother] and [the Child]. But he's that way. You know, as far as [Father's] temperament, I know from their marriage - - . . . . This is not from communication. This is what I heard from the telephone, like when she called me and laid the phone down and I can hear the conversation - - . . . the throwing things, the breaking of things. And I would call him and tell him, don't break up things that I bought, to break his own things.

When questioned further, Grandmother admitted that these phone calls happened prior to the birth of the Child.

Grandmother agreed that Father loves the Child and that the Child loves Father. She also agreed that she never has observed any instance of specific or serious harm to the Child from either Father or Mother. Grandmother further agreed that Father has offered to allow her to spend time with the Child after Mother moved to New Jersey, and that Grandmother has taken Father up on that offer "when [she] wanted to take the time, yes." Grandmother stated: "I don't think, as a grandparent, time should be so - - allowing me or giving me time, providing me with time. It should be, well, when I want him I can get him, and when you've got something to do, if I'm available, I can keep him." Grandmother agreed that since February of 2015, when Father gained custody, that is how things have worked. She stated: "Yes, because that's the way - - I make it work that way, yeah." Grandmother agreed that since February of 2015, every single time she has asked Father if she could spend time with the Child, Father has allowed her to do so. When questioned further about her objections to the fact that Father 'allows' her to see the Child, Grandmother admitted that she knows that as a grandparent she does not "[h]ave any rights."

Grandmother was asked about the incident wherein Mother did not return the Child to Father until the night before school started. Grandmother testified that she had texted Father and asked to have the Child an extra week because she knew that her daughter was getting married. Grandmother further stated:

And he text me back and asked me why - - I think to the point of why the extra week. And I told him we - - did I need to explain why I wanted [the Child] - - he was out of school - - for an extra week? He said no one told him she was getting married. And that was like before that time, like two or three weeks before that time, and he said no one had told him, yeah.

19

Grandmother stated: "It was rough, . . ." but Father did agree to allow them to have the extra week.

Grandmother agreed that after the wedding, Mother took the Child to New Jersey, and that this occurred on the Sunday of the week when the Child's school started on Thursday. Grandmother admitted that she knew that the Child's school was starting on that Thursday. The wedding occurred on the 8th, Mother flew back to New Jersey with the Child on the 9th, and the Child's school started on the 13th. The Child's birthday was on the 12th.

The Child wound up flying back to Chattanooga on his birthday. Grandmother stated:

> What happened was, he was flying back the day before that, and they wouldn't let him on the plane that day. So the way the planes - - and that's the reason he had to do three or four flights instead of one straight flight, because if he waited for that straight flight, he wouldn't have got here till the next day. . . . And I was trying to get him back as soon as I could when I found out that he shouldn't be where he was. . . . You know, when we found out that she shouldn't have taken him, we immediately made an effort to get him back at the time that you wanted him back, because you said you wanted him back a certain day, and I started acting to get him back that day, because I didn't know what to do.

Grandmother testified that the Child flew from New Jersey to Denver and then to Atlanta. Grandmother and her husband met the Child in Atlanta and drove him to Chattanooga.

Mother testified that she is employed in New Jersey by the Trenton School District as an English language arts instructor. Mother was asked about Father's testimony about her jobs, and she stated: "Those accusations are false, because as of record and what they subpoenaed, what is in the record as to what my supervisor stated as to why I'm not there said nothing about conflict." Mother was asked what really happened and if the conflict had anything to do with her fault or deficiencies in her character, and she stated:

> Absolutely not. I have been very fortunate, and I'm humble enough to have been in places where a lot of people haven't. So I've worked for Mayor Berke's administration, I've worked for the Chattanooga Public Library, I've worked for the school system, I have a nonprofit and a business, so I've encounterd a lot of people. And I strongly believe professionally you - - you don't have opportunities to meet people of leadership if you can't conduct yourself in a way where you're presentable,

and to land the kind of jobs that I have.  I'm not just a teacher, I've been in administration, and I'm also a business person.

Mother testified that when she moved back to Chattanooga with the Child in 2010, she became certified as a special educator.  While doing that, Mother worked as a consumer credit financial counselor.  Mother talked about her career, and stated: "My child's a huge motivator why I do what I do."

Mother explained that the parties were divorced in 2012, and she was granted primary custody of the Child.  Around that time, Mother was working at the Chattanooga Public Library doing summer programs.  She testified that she lost her job due to budget cuts.  Mother stated that she then began applying for jobs in Tennessee, Georgia, New Jersey, Philadelphia, and New York.

Mother moved to New Jersey "based on a ten-month contract.  They wanted me to do an ESL program, English as a Second Language program, and teach it.  So I agreed and I moved to New Jersey.  I did the programming, structured the testing.  They were pleased.  I did everything that was required."  Mother testified that she lost that job due to budget cuts.  Mother then worked in summer school for the same school, and then transitioned into another charter network, which was in Philadelphia.  Mother commuted an hour to Philadelphia for this job, and she worked there from August through December.

Mother then applied for jobs in New Jersey.  Mother testified that she started with the Trenton School District in February.  She stated that there is no time limitation on this job:

> It's as long as I - - I make my own schedule.  I tell them the length of time.  If I like the school, I stay, if I don't, I tell them I want to go to another district. . . .  It's totally up to me.  It gives me flexibility, especially with the legal court stuff, having to come home multiple times. . . .  It just - - it fits my lifestyle right now.

Mother testified that she makes a salary of $50,000 to $55,000.  She stated: "At first it was 60, but 50, 55, until I transition to where I want to be."  Mother further stated that she makes $2,500 per month.  When it was pointed out to her that $2,500 per month computes to $30,000 not $50,000, Mother stated: "Yes, I'm aware of that. . . .  It's just a temporary phase until I get the legal stuff over and I tell them what I want to do."  Mother also stated: "I haven't been there a year.  I just started in February.  So the agreement is that much a month until I decide to take a position permanently with the school district."

Mother testified that for the initial job in New Jersey which led to her filing the notice to relocate: "My offer was $60,000, what I presented during the hearing." Mother was asked if she grossed $5,000 per month during the time she worked there, and she stated: "I can't recall that." She also agreed that she did not work for the full ten months of the contract.

Mother was asked if when that initial job in New Jersey ended she looked for employment in Chattanooga, and she stated: "No." Mother was asked if since the time that she was told by the New Jersey school system that she was not going to be employed, which occurred in May, June, or July, she had looked for employment in Chattanooga, and she stated: "As a - - an adult and a parent, no, because I have - - I have bills, I have a lease agreement, I have responsibilities I couldn't get out of, so no, I wouldn't have thought to do that."

Mother was asked if her lease ended in January of 2016, and the following exchange occurred:

A. I'm still in my lease.
Q. You renewed it, ma'am, did you not?
A. I'm still in my lease.
Q. Please answer my question.
THE COURT: Answer the question.
A. Yes, I'm in my lease.
Q. You renewed it in Janaruy 2016, correct?
A. Yes. I'm still there.

Mother was asked if she had refused to look at any jobs that paid less than $45,000, and she stated:

To my understanding, if - - every job that I've accepted paid more. So as a parent it was my responsibility to make sure that my son got the best, so going down a job or making lower than what I've been paid, it makes a difference in his life, it does. So, no. I felt that it was my responsibility and my duty as a parent to keep looking for the best opportunities for us.

Mother was asked about the incident that Father had testified about which he claimed led to the divorce, and she stated:

So [the Child] was born, and I'm experiencing a lot of the shifting in the parenting and [Father] being very controlling about how I raise my son

22

in the home as a mother. At the time of the incident - - leading up to the incident, we went out to eat. [The Child] - - actually, it goes back to [the Child's] daycare and his teacher notifying me of him biting other kids, and that he has a problem with teething, and she was giving me some instructions of how to tackle, you know, training him in the teething phase of his life. And I discussed this with [Father] and - - I'm sorry, [Father] - - and as [Father] usually does, he has his opinions in what he felt was more appropriate and what wasn't. And so when we were out to eat later that weekend, because daycare's Friday, that Sunday [the Child] began biting on me. And I was - - I would look at [the Child] and say, No biting, because I was taught, when I did social work - - I took a CPS class, child protective service class, so I know how to deal with children from infant to school age. So when you are talking to a child and correcting them, you look at them in the eye and you let them know in a very assertive way don't do that and, you know, do not bite. And at the time he was teething, so we had a teething ring and we gave it to him.

After dinner we went home. And every Sunday we always take a nap. And I was laying down with my son in the other room, and [Father] was in, I think, the living room at the time, and [the Child] bit me. And I looked at [the Child] and I told him - - you know, eye contact - - and I said, [the Child], you do not bite Mama. As soon as I said that, [Father] stormed into the room, hunched over the bed where I'm laying with my child, and began to choke me, literally lift me out of the bed choking me, and my son is in my arms, and he's saying, Give me the child, give me the child.

As a mother, my instinct was I'm not going to release this person that had me in a choke hold. And he's standing over me. I couldn't even protect myself. And I'm like, oh, my gosh. And I had to release my son to save my life, because I thought he was going to choke me to death.

And at that point I told him, I'm calling the police. I don't even - - I don't even know how I was even able to talk. He had me constrained. And I called the police, and the police came. And the police had heard my testimony and did a background record of 911 calls . . . . I called 911 five times on [Father] while we were married due to domestic violence and disputes. The majority of the time I was very afraid to - - to state what he did to me. He did most of the talking, because I was more so reserved and quiet, so he gave testament. And I have a record of - - of police 911 calls when he said he's thrown things and we just - - we were just having a dispute and, you know, it's okay. So that's how he handled it.

But this time I told - - I spoke and I told what happened, and I told the truth as to what happened.

Mother was asked about her relationship with the Child since Father has had custody, and she stated:

My relationship with [the Child] will always remain strong, no matter what, that's just a natural bond. . . . However, during this legal 14 months of torment, it has been horrible maintaining the communication between my son and I. I have reached out - - I have text messages on top of text messages right here of [Father], every time I reached out to my son, he said it's his phone, he's in control. Here's another text message. He says his son - - he said my son never asks about me, he doesn't ask about me. I mean, that's hard to believe that, as a mother, I had the child from birth to five years old and my son doesn't ask about me. Other text messages stating that - - I'll read you some. . . . So I would reach out to my son. When I found out February, I believe the exact date is the 16th, when this ex parte was in place, I was devastated, and I had to decide was I going to fight for my son to come back like it was, for a better life for us, or give in to control and just take a mediocre life and just, you know, be content with whatever someone else wanted for me. So I start reaching out to [the Child]. I started being very consistent with reaching out to him.

His father proposed the parenting plan at the time, which I physically never saw; I just went off of what he stated in his text messages, that I was only able at the time to talk to [the Child] on Tuesdays and Thursdays at 7:00. Tuesdays and Thursdays, two days a week. So from having your son from birth to five years old to talking to him two days a week, and you're not even in the same city or town, was very unreasonable and irrational to me. I felt as if it was control and him retaliating because I left.

Mother was asked for examples of Father's alleged controlling behavior, and she stated:

I mean, when we were married, I worked. I worked. After the first year, once I had landed at the Wilkinson Center for five years of the six years we were together, I was there. I worked while he was in school. I paid his way through school. I assisted in that process. . . . I even worked while pregnant, supporting him in school. . . . Financially the burden was on me.

24

I was - - and when I was in school, I still worked. . . . It's always been that way. And then the money and how it was managed, I had to manage it. I had to put away money in a separate account to make sure we had money, because [Father], he went through a series of different jobs when he was in Texas, and he voluntarily quit a job without telling me at UPS, while I was working. It was a very stressful, very controlling situation. He would ask for assistance. I was there. It was our money. I saw what went into an account from his mother and his church to support him through school. So it's very relevant, it's very factual that [Father] worked part-time. He had the flexibility of doing so while he was in school  he was in school for eight years consistently, at DTS, Dallas Theological Seminary.

Mother was asked about her community in New Jersey, and she stated:

I'm part of a lot of organizations. I'm part of a bipartisan organization, a political organization called Organizing For Action, I'm part of the leadership team in the state of New Jersey. I'm over economic opportunity of that organization. I'm also part of a sorority, Alpha Kappa Alpha Sorority, Incorporated, where it's an alliance of sisterhood; wherever you go, wherever you move, you have sorority sisters that you meet with and we assist each other. I'm also part of a church family, an active part of their curriculum committee, so I help with the curriculum writing for the pastor and his sermons, and I assist in that way. . . . So - - and I'm also part of a business networking community there, as well. So I have a lot of organizations, friends, networks in New Jersey and Philadelphia and New York.

Mother testified that Father did not inform her before he changed the Child's school. She testified that when she learned that the Child was not in his old school, Mother texted Father and asked where the Child was in school. Mother testified that Father did not respond. Mother stated that a friend from her father's church told her that the Child had been seen at his new school. Mother was asked if she ever contacted the Child's new school, Bess T. Shepherd, to ask them to send her the Child's report cards, and she stated: "Absolutely not, because [Father] never put me down as a contact or free to get anything. When I went to Charter School of Excellence and tried to get that information, which is proven, it was blocked, it was you have to contact [Father]."

Mother was asked if there had been any medical issues with the Child, and she stated:

Absolutely. The times that I've been home [the Child] has always had medicine. And with me having [the Child], he has never been on the amount of medicine that he's on. He has a nasal spray, he has an eye drop, he has an over-the-counter cough medicine. I was looking to see what was actually prescribed like from a pharmacist, and I'm looking like, how is he taking all this medicine, and I had him for five years, I've never had - - [the Child] - - you can look at his school records, you can look him up, how many times he's missed school, daycare. I just never see my son sick the way he has been the last year up to this time. And he just got over strep throat last month, between last month and this month, that I'm aware of.

Mother was asked if she ever told Father that the days and times for phone calls with the Child were not good for her, and she stated: "Absolutely. I told [Father] I did not agree. I never agreed." Mother was asked if Father had provided her with more time with the Child than called for in the parenting plan, and she stated: "Periodically. . . . When you say more time, periodically, it's not all the time. There's a difference." Mother was asked if she had wanted to get the Child for the Child's entire Christmas break, both her time under the parenting plan and Father's time, and she stated: "I don't know a mother that wouldn't, that doesn't have their son with them that they've had since birth." Mother stated that although Father did allow her extra time during that break he did not allow her the extra overnight time she requested.

Mother was asked if she had talked to the Child about it being Father's fault that she and the Child are apart, and she stated:

No. I talk to my son. My son is emotionally traumatized by this arrangement of parenting plan that his father implemented. My son has many questions, as I can attest to, to the parenting plan that his father has put in place, and is very questionable as to nurturing the relationship between a mother and child with the strain of when I get him and the period of time he has to leave.

Mother was asked if she blames Father for the current parenting arrangement, and she stated: "Absolutely." She was asked if she blamed others also, and Mother stated: "No." When questioned further about whether she blamed Judge Thomas for the current arrangement, Mother finally admitted:

I have - - I know blame is a very strong word. I blame [Father] for petitioning opposition to relocation, and I was disappointed with Judge Thomas approving a relocation - - a non-relocation of a child that's been

with their mother that he put as the primary parent.  That was very disappointing, yes.

Mother was asked if she had made allegations about Judge Thomas having alcohol issues, and she stated:

> I have made some reference to what I found out, from being all the way in New Jersey during the same time my case was being heard, that that issue has came up locally, it was brought to my attention, and I was very concerned as a parent, yes. . . .  It was my position for 14 months, no, my hearing was not fairly given.

Mother stated: "I was disappointed with Judge Thomas, as I stated before, and I blamed [Father] for the occurrence of what we have been through for 14 months."  When asked if she put any of the blame on herself, Mother stated: "Absolutely not."

Mother admitted that she had texted Father:

> I was stating the fact of your temporary stunt of an ex parte you, your lawyer, and a judge that have personal alcoholic issues in the home put in place without giving me a fair hearing.  A temporary order without a statue (sic) of limitations.  Totally against the law and I wasn't served.  So what false allegations can I sue you and your lawyer over the false ex parte?

Mother admitted that Father responded by texting: "You call it what you want.  All I know is he better be back . . . on time or you're going to be dealing with the police again for kidnapping . . . ."  Mother was questioned further about her text to Father asking what false allegations she could sue him and his attorney for regarding what she alleged was a false ex parte order, and she stated:

> And if you read down and up above it, which I have right here, you will see where [Father] threatened me and stating that he was going to do a kidnapping on me without proper evidence if I didn't bring [the Child] back, in bed, by April 3rd at 10:00.

Mother was asked if she threatened to filed a class action lawsuit against Father for discrimination, and she stated: "Yes, I feel discriminated, yes."

Mother asserted that she never violated a court order.  Mother was asked about the incident in July of 2015, when she did not return the Child to Father until the day before school, and she continued to assert that she did not violate the court order.  Mother

admitted that previously she and Father had agreed that she would return the Child on July 31, 2015. Father then allowed Mother extra time because Mother's sister was getting married. Mother did not return the Child until August 12, 2015.

Mother was asked what her intent was when she took the Child back to New Jersey on August 9th when school started on the 13th, and she stated:

> Thank you for that question, because when you said intent, I read that as my motive was to clearly, without any reason, just take my son back to New Jersey. I spent 14 months without my son. I think - - well, up to that point I spent almost half a year without my son, so I think it was very clear that my motive wasn't just to go get my son and bring him to New Jersey. My intent was, based upon the appeal being filed, that everything was going to be finalized within a certain time frame, which was July. I knew the timing. And when it came in, it was my understanding, based on kind of what I read on the - - in the appeal, that things were reversed and reprimanded (sic). Mind you, I'm an educator, I'm not a lawyer, I don't know legal lingo as far as reprimanding (sic) and so on and so forth, until it was brought to my attention from my lawyer, hey, it means this, it doesn't mean that. It is reversed, however, this is the conditions with it.

When questioned further Mother admitted that her intent was to enroll the Child in school in New Jersey because she "was under the impression that the order was reversed, based upon those reasons of intent."

Mother was asked if she used an email address of: jessica_broadnax2013[at]yahoo.com, and she stated: "Yes. I have multiple e-mails, but I use certain ones more frequently." Mother was shown an email from Father to the address Jessica_Broadnax2013[at]yahoo.com; blessedjessica2013[at]gmail.com; and thankfulsarah[at]comcast.net containing the Child's report card from school. Mother stated that her mother's email address was thankfulsarah[at]bellsouth. Mother was questioned further about her various email accounts, and the following exchange occurred:

> Q. How many e-mail accounts do you have, ma'am?
> A. I have my main one, I have work, and I have a business e-mail account.
> Q. And in addition to that you have the two e-mail accounts that I just listed?
> A. I don't recall those e-mail accounts or when I opened them. I know my mother's e-mail, but those e-mail accounts I don't recall. I don't recall those e-mail accounts.

Q. Ma'am, five minutes ago you did recall the Yahoo account, five minutes ago. You recalled Jessica_broadnax2013[at]yahoo.com.

A. I don't know.

THE COURT: I got it.

A. Fair statement, I don't know, I don't.

Mother was asked if she had provided Father with her main, work, or business email account addresses, and she stated: "No, because [Father] has my phone number and he has my current address, he knows where I work, he has my mother's physical address, as well as her e-mail. He has any contact he needs to get straight to me."

Mother testified that when she had primary custody of the Child, Father did not pay child support consistently, but "gave when he wanted to give what he wanted to give in the instant that he gave it." When questioned further, Mother admitted that Father was not behind in child support payments.

Mother was asked if since February of 2015, she had made estimated payments of what she thought was appropriate in child support, and she stated:

[Father], in his parenting plan, stated he wanted child tax credit and to claim [the Child] on his income tax, as well as stop his support payments when he put in the ex parte to switch primary custody, when upon receiving a new job I wanted to support me and my son. And that was the purpose of why that job was given, to support me and my son upon relocating.

Mother admitted that she had made no child support payments "[d]irectly to [Father], no, no."

Mother was asked if it was her choice to leave the Child with her parents when she moved to New Jersey, and she stated: "My choice as a parent was taken away from me." Mother was asked if she chose not to notify Father that she was moving to New Jersey and leaving the Child with her parents, and she stated: "I don't know." Mother finally admitted that she recalled Father asked her if she had moved and admitted that she did not respond. Mother admitted that Father sent her a text message on February 5, 2015, that stated:

[O]n January 26, I asked both you and your mother if you were still living in Chattanooga or New Jersey. Neither one of you replied, although you both responded to e-mails I sent earlier that morning unrelated to this. It appears that you have moved and changed your residence to New Jersey and still took the job there. If this is the case, then I'm requesting to be the

29

custodial parent, as I already have joint custody with you. I'm trying to work with you so that we can avoid another lengthy legal process and facilitate a smooth and peaceful transition as it pertains to [the Child]. I'm more than happy to work with you regarding the time you spend on the phone with [the Child] and even when it comes to visitation. We can see what is the most feasible solution given your recent move. [The Child] needs both of his parents in his life. We need to work together to maintain a peaceful environment for him and facilitate a good relationship between him and both of us. When can we discuss this?

Mother was asked if she thought it was appropriate to leave the Child with her parents when she moved to New Jersey instead of leaving the Child with Father, and she stated:

> I felt it was appropriate to be established and move to New Jersey and not have a child in the middle of that before the order was in place. And then when the order was given, then from there my attorney contacted me and we spoke on the best arrangements for [the Child] regarding what you-all took action on.

After the hearing, the Trial Court entered its order on May 5, 2016 finding and holding, *inter alia*: "It is in the best interests of the child to remain in the primary custody of the Father . . . ." In its May 5, 2016 order the Trial Court also ordered entry of a new permanent parenting plan which granted Father primary custody, set child support, and established child support arrearages. Mother appeals to this Court.

## Discussion

In her brief on appeal, Mother raises multiple issues with regard to the Trial Court's determinations about the specific factors contained in Tenn. Code Ann. § 36-6-106. All of these issues, however, are arguments addressed at the dispositive issue of whether the Trial Court erred in finding that it was not in the Child's best interest to move to New Jersey with Mother. Father raises an issue regarding whether the Trial Court erred in refusing to award Father his attorney's fees.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Kelly v. Kelly*, 445 S.W.3d at 692.

30

Our Supreme Court has noted that "[p]arental relocation cases are often wrenching, with weighty competing considerations and a profound impact on both parents and children." *Aragon v. Aragon*, 513 S.W.3d 447, 455 (Tenn. 2017). Furthermore, "[r]eal world complexity steals into the equation when we consider, as we must, that events and lives have not stood still while this custody dispute has been in the courts." *Id*. at 468 (quoting *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4 (Tenn. Ct. App. July 21, 1999), *no appl. perm. appeal filed*.

In *Lawrence v. Broadnax I*, we affirmed the Trial Court's determination pursuant to Tenn. Code Ann. 36-6-108(d)(1)(A) that Mother's proposed "relocation does not have a reasonable purpose." Tenn. Code Ann. § 36-6-108(d)(1)(A) (2014). We remanded the case for a determination of "whether or not to permit relocation of the child based on the best interest of the child" pursuant to Tenn. Code Ann. § 36-6-108(e), which provides:

> (e) If the court finds one (1) or more of the grounds designated in subsection (d), the court shall determine whether or not to permit relocation of the child based on the best interest of the child. If the court finds it is not in the best interests of the child to relocate as defined herein, but the parent with whom the child resides the majority of the time elects to relocate, the court shall consider all relevant factors including those factors found in § 36-6-106(a)(1)-(15).

Tenn. Code Ann. § 36-6-108(e) (2014). These statutory factors include:

> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;
> (3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a) (2014).

In her brief on appeal, Mother argues that the Trial Court should have found that factor (a)(1) favored her more than it favored Father because Mother was the primary residential parent for four and a half years, because Mother is an educator with a Master's Degree in education, and because Father has "no special training or experience raising a child." Mother has missed the point. The issue is not whether Mother has been the primary residential parent for longer than Father, and it is not what each party has chosen as a profession. To assert that someone is a better parent simply because they have a degree in education and their spouse does not is baseless. No "special training or experience" is required to parent a child. If such were the case, then a very large majority of parents would be unqualified to be parents. The record before us on appeal is devoid of evidence showing that Mother's degree in education makes her a better parent than Father. While a parent's degree in education or some sort of "special training or experience" may well be appropriate facts for a trial court to consider in a particular case, they are relevant only to the extent they impact the best interest of the child. In its memorandum opinion ("Memorandum Opinion") incorporated into the May 5, 2016 order by reference, the Trial Court found that the evidence with regard to factor (a)(1) was "weighted equally" to each of the parties. The evidence in the record on appeal does not preponderate against this finding.

In her brief on appeal, Mother argues that the Trial Court erred in finding that factor (a)(4) favored Father. Mother asserts that both parties are "highly educated persons," and that neither has shown a disposition "to deprive the child of food, clothing, medical care, education or other necessary care."

With regard to factor (a)(4), in its Memorandum Opinion the Trial Court specifically found:

I find the father, as a branch manager and assistant vice-president of a well-respected bank, father has been in a better position to clothe and provide medical care and education for the child.

And let me also say that I'm not going through all of the evidence, this is just some of the evidence that I found applicable to each factor, but the Court expressly relies upon the entire record. . . .

There was evidence of the thrush infection that was addressed by the father, the father also being focused on the education and homework of the child, and that the grades have gone up of the child after the child has been in custody of the father. Now, when it comes to Exhibits A and B, that is the school records, that was not essential to this decision. I decided this mainly on the testimony rather than Exhibits A and B, such that, if Exhibits

33

A and B had been excluded, I would still reach the same decision.

The mother has not applied for Chattanooga jobs and abandoned searching for jobs in Georgia. The mother provided no evidence of present education opportunities for the child in Trenton, New Jersey; therefore, I find factor 4 is weighted in favor of the father.

The evidence in the record on appeal shows that although the Child had a thrush infection that Mother was aware of, Mother delivered the Child to Father without alerting Father to the infection and without getting care for the Child before delivering him to Father. Furthermore, the evidence in the record on appeal shows that Father has remained steadily employed, at least since the time of the birth of the Child. The evidence in the record on appeal shows that Mother, for whatever reasons, has not always been able to maintain steady employment during that time. In fact, the evidence in the record on appeal shows that during the year that Mother has lived in New Jersey, she has held three jobs, one of which was not even in New Jersey but instead was in Philadelphia. The evidence in the record on appeal also shows that Father is concerned about the Child having appropriate time to complete homework and that Father structures the Child's schedule to allow time for homework. The evidence in the record on appeal does not preponderate against the Trial Court's finding that factor (a)(4) favored Father.

In her brief on appeal, Mother argues that the Trial Court erred in finding that factor (a)(5) favored Father. Mother asserts that she had primary custody from the time she moved with the Child from Dallas to Chattanooga "until Trial Court Judge Neil Thomas awarded primary residential placement to Father without a best interest determination on February 10, 2015."

Mother has mischaracterized the situation. Just as noted by our Supreme Court in *Aragon*, events and lives have moved on while this custody dispute has been in court. By order entered in January of 2015, the Trial Court granted Father's petition opposing Mother's proposed relocation after finding that the proposed relocation was not for a reasonable purpose. Mother then chose to move to New Jersey and leave the Child with her parents in Chattanooga without notifying Father. After Father discovered that Mother had moved to New Jersey leaving the Child with her parents, Father moved for a temporary order granting him custody. Mother's parents had not been given physical custody of the Child by the Trial Court. Mother had, but she had relinquished physical custody of the Child to her parents. Therefore, the choice faced by the Trial Court in entering the Temporary Order was not whether to change physical custody from Mother to Father. The real choice was whether to give Father physical custody of the Child or leave the Child in the physical custody of a non-parent. The February 10, 2015 Temporary Order granted Father custody based upon the fact that Mother had moved to

34

New Jersey and left the Child in the care of a non-parent. This was a situation of Mother's own making. Mother could have made the choice not to move to New Jersey at that time, thereby obviating the need for Father to move for a temporary order granting him custody.

With regard to factor (a)(5), the Trial Court specifically found in its Memorandum Opinion that "the father has been the primary caregiver and has demonstrated he has handled these parenting responsibilities very well over a year, since February of 2015; therefore, I find this factor favors father." The evidence in the record on appeal show that Mother's choices led to Father having custody of the Child since February of 2015, which gave Father the chance to demonstrate how he handles day-to-day long-term parenting responsibilities. The evidence in the record on appeal does not preponderate against the Trial Court's findings relative to factor (a)(5).

In her brief on appeal, Mother argues that she "is a completely innocent victim of the Trial Court having ruled against her on the relocation and custody issues previously in this case without a best interest analysis, which resulted in [Father] having custody for approximately one year prior to the belated best interest analysis." Mother argues that the Trial Court's finding as to factor (a)(10) "is in essence a punishment to the victim for failure to follow the law." Mother further asserts that she "had undisputed primary residential placement of the child for almost 4.5 years of his 5.5 year life prior to the child being taken away without a best interest analysis."

Mother again has mischaracterized the situation. The Child was not taken away from Mother. Mother made the choice to move to New Jersey and leave the Child with a non-parent rather than with Father. The Trial Court's February 2015 order took the Child 'away' from the non-parent who was exercising physical custody and 'gave' the Child back to a parent. This action was necessitated by Mother's choice to move to New Jersey after the Trial Court had determined that the proposed relocation was not for a reasonable purpose. The Trial Court found that Mother's proposed relocation to New Jersey was not for a reasonable purpose, and this Court affirmed the Trial Court's determination. Despite these rulings, Mother made the choice to move to New Jersey. Mother's choice resulted in Father eventually being granted primary custody, which, as found by the Trial Court, allowed Father to demonstrate his parenting skills on a long-term day-to-day basis.

With regard to factor (a)(10), in it's Memorandum Opinion the Trial Court specifically found:

> I find it has been much more, in a more demonstrated stability with the child living here and, more importantly, to maintain continuity here rather than be uprooted and move to New Jersey, again, the family network also

being very important there, but also just continuity being very important there, and therfore, I find factor 10 favors Father.

The evidence in the record on appeal shows that many of the Child's extended family members, including Mother's family, reside in or near Chattanooga. The evidence further shows that Father has made the effort to allow the Child to develop relationships not only with Father's extended family, but also with Mother's extended family. The evidence in the record shows that the Child has visitation and telephone contact with Mother's mother, Mother's sisters, and the Child's cousins. Grandmother and Mother's sisters, Ms. Edwards and Ms. Whaley, all testified that Father has allowed them to have visitation with the Child basically whenever they have asked. In fact, Father has allowed the Child to spend the weekend with Mother's family members when they have asked. The evidence in the record on appeal also shows that the Child visits with Father's extended family on a regular basis and that on Sundays a number of members of Father's extended family gather at Father's grandmother's house to spend time together. The evidence in the record shows that the Child has a number of relatives on both sides of his family who demonstrate love, care, and concern for the Child. Furthermore, the evidence in the record on appeal reveals that the Child has no family in New Jersey other than Mother. The evidence in the record on appeal does not preponderate against the Trial Court's finding that factor (a)(10) favors Father.

In her brief on appeal, Mother argues that the Trial Court erred in finding that factor (a)(11) favored neither party. Specifically, in its Memorandum Opinion the Trial Court found:

> As to 11, evidence of physical or emotional abuse to the child, to the other parent, or to any other person, regarding the fingernail marks while in Mother's custody, there was evidence of that, as well as domestic violence issues involving the father, but the domestic violence issues were dismissed and expunged. And as I explained before, the fingernail marks, even though they were while in Mother's custody, there was no evidence that Mother knew or should have known or even caused the fingernail marks; therefore, that factor is weighted equally to both parents.

In her brief on appeal, Mother argues that "Father did not deny using violence the day he was arrested and had an order of protection issued against him." Mother also argues that based upon this same evidence the Trial Court should have restricted Father's parenting time under Tenn. Code Ann. § 36-6-406(a)(2), which provides:

**36-6-406. Restrictions in temporary or permanent parenting plans.**

36

(a) The permanent parenting plan and the mechanism for approval of the permanent parenting plan shall not utilize dispute resolution, and a parent's residential time as provided in the permanent parenting plan or temporary parenting plan shall be limited if it is determined by the court, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct:

\* \* \*

(2) Physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.

Tenn. Code Ann. § 36-6-406(a)(2) (2014).

A careful and thorough review of the record on appeal reveals that both parties testified about the incident Mother argues about, the one which Father testified led to the parties' divorce. The record reveals this to be very much a he said – she said situation, and the Trial Court clearly made crediblity determinations when making its findings and ultimate determination regarding this factor. With regard to credibility, our Supreme Court has instructed:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

With regard to potential restrictions pursuant to Tenn. Code Ann. § 36-6-406, the Trial Court in its Memorandum Opinion specifically found and held "there was evidence of a domestic violence charge, but it was dismissed and expunged. There was evidence of fingernail marks, but that was not established as being caused by the mother or that the mother knew or should know about it." The evidence in the record on appeal does not preponderate against these findings made by the Trial Court. Furthermore, the Trial

37

Court specifically stated that it had evaluated "the credibility of all the witnesses" and that this "evaluation was essential to the Court [in] determining the preponderance of the evidence in this case." We find no error with regard to the Trial Court's determinations with regard to Tenn. Code Ann. § 36-6-106 (a)(11) and Tenn. Code Ann. § 36-6-406(a)(2).

Mother argues in her brief on appeal that the Trial Court erred in finding that factor (a)(14) favored Father. Specifically, in its Memorandum Opinion the Trial Court found: "Number 14, each parent's employment schedule, the father has a stable job here in Chattanooga, Mother has a job, but not as stable as Father's work history over a period of time." The evidence in the record on appeal does not preponderate against these findings. The evidence shows that Father is an assistant vice-president and branch manager for SunTrust Bank and that he anticipates remaining in this employment. Furthermore, Father testified about his job history and explained that he specifically accepted certain jobs in order to allow him to live closer to where the Child was living. The evidence further shows that during the year she has lived in New Jersey, Mother has had three jobs, one of which was not even in New Jersey, and that her current job still is not considered a permanent position. Additionally, the evidence shows that when she lost her job in New Jersey, Mother did not attempt to find a job closer to where the Child is living. The evidence in the record on appeal does not preponderate against the Trial Court's findings relative to factor (a)(14).

Mother's arguments in her brief attack the Trial Court's findings as to specific statutory factors, but Mother has missed the issue. Determining best interest is not a mathematical formula wherein one can find that certain factors favor one parent over another and then somehow add up the factors to determine the end result. Rather, a court must consider all of the relevant factors in light of all of the facts and the entire situation when determining the best interest of a child.

In addition to all of the findings discussed above, in its Memorandum Opinion the Trial Court also found, *inter alia*:

> [T]he Court finds by a preponderance of the evidence that the mother has been very disruptive, such as, on the phone calls, interfering with the father's parenting via the telephone calls, banging the pots and pans and things of that nature, and being argumentative.
>
> * * *
>
> There was evidence that the Court finds by a preponderance of the evidence that the father has provided more time than he needed to, more

38

time to the mother, the father offers to facilitate visitation not only with the mother, but also including the mother's family. And that was substantiated also by testimony of Sarah Broadnax. The father speaks positively with the child about the mother, and this facilitates a close parent-child relationship. The father has been respectful of the mother's telephone visits with the child, removing himself from the room during that phone conversation. And there was evidence that the mother claims Judge Thomas's order is unlawful.

\* \* \*

As testified by Syletta Edwards, even though the father was away for a period of time, it is better for the child for both parents to be with the child, and I agree with that. The Court finds it is Mother's choice to relocate to New Jersey, which has not only been found by Judge Thomas to be unreasonable, but also the Court of Appeals finds it to be unreasonable, especially when contrasted to looking at Georgia, which has no salary cap, or some other appropriate position in Chattanooga, or closer than New Jersey. There was no attempts to even try to find a job in Chattanooga in the educational field, and thus money was chosen over custody. This is all contrasted to the child's family network, which is here, on both sides of the family, to support his emotional needs and developmental level; . . . .

\* \* \*

[T]he grades went up after father had custody, and there are many relatives and, just as importantly, there are many child-age relatives, in other words, relatives who are relatives to the child who are children, in Chattanooga, as opposed to no evidence of any relatives, let alone child relatives, in New Jersey. The Court finds  that . . . the child has been well-adjusted at school. The Father's network of family and Mother's network of family is here, whereas Mother, when it comes to family, is isolated in New Jersey.

The evidence in the record on appeal does not preponderate against these findings made by the Trial Court.

The evidence in the record on appeal shows that Mother places blame for the current situation on everyone but herself. The evidence further shows that Mother has in the past failed to comply with court orders, most notably when Mother failed to return the Child to Father until the night before the Child's school began. Additionally, Mother herself admitted that during the time that Father has had primary custody, Mother has

paid no child support. The Trial Court carefully considered all of the relevant factors in making its determination that it was in the Child's best interest to remain with Father and not to move to New Jersey with Mother. We find no error in the Trial Court's determination. We, therefore, affirm the Trial Court's May 5, 2016 order.

Finally, we consider the issue raised by Father regarding whether the Trial Court erred in refusing to award Father attorney's fees. As pertinent, Tenn. Code Ann. § 36-6-108 provides that: "Either parent in a parental relocation matter may recover reasonable attorney fees and other litigation expenses from the other parent in the discretion of the court." Tenn. Code Ann. § 36-6-108(i) (2014). We find no abuse of discretion in the Trial Court's decision not to award attorney's fees to Father. Furthermore, in the exercise of our discretion, we decline to award either party attorney's fees on appeal.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Jessica Marcel Broadnax, and her surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE